Case No. 21-3418

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔒𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## FOR THE SIXTH CIRCUIT

IN RE: E. I. DU PONT DE NEMOURS AND COMPANY
C-8 PERSONAL INJURY LITIGATION

TRAVIS ABBOTT; JULIE ABBOTT,

*Plaintiffs-Appellees*

v.

E. I. DU PONT DE NEMOURS AND COMPANY,

*Defendant-Appellant*

On Appeal from the United States District Court for the Southern
District of Ohio, Case Nos. 2:17-cv-00998 & 2:13-md-02433

Brief of Defendant-Appellant
E. I. du Pont de Nemours and Company

Lauren S. Kuley
Colter L. Paulson
Squire Patton Boggs (US) LLP
201 E. Fourth Street
Suite 1900
Cincinnati, Ohio 45202
Telephone: (513) 361-1200
Fax:  (513) 361-1201
lauren.kuley@squirepb.com
colter.paulson@squirepb.com

Damond R. Mace
Aneca E. Lasley
Squire Patton Boggs (US) LLP
4900 Key Tower
127 Public Square
Cleveland, OH 44114
Telephone: (216) 479-8500
Fax:  (216) 479-8780
damond.mace@squirepb.com
aneca.lasley@squirepb.com

John A. Burlingame
Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000
Fax: (202) 457-6315
john.burlingame@squirepb.com

*Attorneys for Appellant E. I.*
*du Pont de Nemours and Company*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to 6th Cir. R. 26.1, Defendant-Appellant E. I. du Pont de Nemours and Company makes the following disclosures:

1.   E. I. du Pont de Nemours and Company, the Defendant in this case, is a subsidiary of Corteva, Inc., a publicly-owned corporation.

2.   The Chemours Company, a publicly-owned corporation, is a party to agreements with Defendant E. I. du Pont de Nemours and Company that give it a financial interest with respect to claims in this proceeding.

3.   DuPont de Nemours, Inc., a publicly-owned corporation, is also a party to agreements with Defendant E. I. du Pont de Nemours and Company that give it a financial interest with respect to claims in this proceeding.

/s/ Damond R. Mace
Counsel for Appellant E. I. du Pont de Nemours and Company

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ..................................................i

TABLE OF AUTHORITIES .......................................................... iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT .........................................1

JURISDICTIONAL STATEMENT ........................................................2

STATEMENT OF THE ISSUES........................................................2

STATEMENT OF THE CASE..........................................................3

    I.    The District Court's Ruling on Collateral Estoppel............................4

        A.    The court told the parties the early trials were meant to be instructive, but not preclusive ....................................4

        B.    The earlier trials involved significantly different facts and different negligence claims from the *Abbott-Swartz* trial..........5

        C.    The district court then applied non-mutual, offensive collateral estoppel ....................................................7

    II.    The Trial Court's Rulings on Specific Causation ...............................8

        A.    The *Leach* Agreement created a Science Panel to study C8 and human disease...........................................8

        B.    The Science Panel found that the amount of risk of getting testicular cancer increases with substantially increased cumulative blood levels of C8 ................................10

        C.    The court excluded all expert questioning and evidence on Mr. Abbott's amount of increased risk of cancer based on his individual dose of C8, and excluded all affirmative specific causation opinions by DuPont's experts ...................12

    III.    The *Abbott-Swartz* consolidated trial .................................15

SUMMARY OF ARGUMENT ........................................................16

ARGUMENT ......................................................................18

    I.    The District Court Improperly Applied Non-Mutual, Offensive Collateral Estoppel to Take Plaintiff-Specific Issues Away From the Jury.....................................................18

A.    Ordering preclusion without notice or representative cases was unfairly prejudicial, and deprived DuPont of due process ................................................................20

B.    The plaintiff-specific verdicts in the prior trials should not have been given preclusive effect in the *Abbott-Swartz* trial ................................................................25

C.    The court disregarded outcome-determinative fact differences among the plaintiffs, and applied preclusion to non-identical and non-essential issues that were not actually decided ................................................................27

D.    The court should not have applied preclusion regarding the Ohio Tort Reform Act ................................................................32

II.    The District Court Erred by Excluding All Expert Testimony and Evidence on the Dose-Response Relationship Between Testicular Cancer and C8 Blood Levels, and by Allowing Specific Causation Opinions That Did Not Consider the Same ........33

A.    The Science Panel did not find that the minimum threshold exposure for class membership, .05 ppb of C8, is likely to cause testicular cancer in an individual ................35

B.    Mr. Abbott's specific causation expert should have been excluded because he premised his unscientific opinions on the trial court's erroneous rulings on the Science Panel Report, rather than Mr. Abbott's own dose ............................39

C.    The court erred by allowing Plaintiffs to tell the jury that the class membership threshold, .05 ppb of C8, was a sufficient amount to likely cause Mr. Abbott's cancer ............43

D.    The court erred by excluding all opinions that Mr. Abbott's cancer was more likely caused by GCNIS, or idiopathic ................................................................45

III.    The District Court Erred by Ruling in Favor of Mr. Abbott as a Matter of Law on the Statute of Limitations ......................................49

A.    The issue of when Mr. Abbott had notice of a link to C8 should have been decided by the jury ......................................50

1.    Extensive evidence supported DuPont's statute of limitations defense ................................................................50

      2.    The court improperly denied DuPont's right to reasonable inferences as the nonmoving party ..............54

  B.    The issue of when Mr. Abbott had notice of his 2015 cancer also should have been submitted to the jury ................55

CONCLUSION ......................................................................................................56

DESIGNATION OF DISTRICT COURT DOCUMENTS

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                    **Page**

*Abbott v. Michigan*,
    474 F.3d 324 (6th Cir. 2007) ...............................................................19

*Ackison v. Anchor Packing*,
    897 N.E.2d 1118 (Ohio 2008) ............................................................33

*Adams v. United States*,
    2010 U.S. Dist. LEXIS 116052 (D. Idaho Oct. 29, 2010)...................24

*In re Air Crash Disaster at Stapleton Int'l Airport*,
    720 F. Supp. 1505 (D. Colo. 1989).....................................................22

*Allen v. Verson Allsteel Press*,
    957 F.2d 275 (6th Cir. 1992) ...............................................................29

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).............................................................................54

*Bajzel v. Air Tool Service*,
    1990 Ohio App. LEXIS 2257 (June 7, 1990) .....................................56

*In re Bendectin Prod. Liab. Litig.*,
    749 F.2d 300 (6th Cir. 1984) ................................................. 16, 19-22

*Black v. Ryder/P.I.E. Nationwide*,
    15 F.3d 573 (6th Cir. 1994) .................................................................27

*Bland v. Verizon Wireless*,
    538 F.3d 893 (8th Cir. 2008) ...............................................................48

*Bower v. Westinghouse Elec.*,
    522 S.E.2d 424 (W.V. 1999) ................................................................9

*Browning v. Burt*,
    613 N.E.2d 993 (Ohio 1993) ...............................................................51

*In re Chevron U.S.A.*,
    109 F.3d 1016 (5th Cir. 1997) ................................................19, 22, 25

*CHKRS, LLC v. City of Dublin*,
   984 F.3d 483 (6th Cir. 2021) ......................................................................16, 28

*Coffey v. Smith & Wesson*,
   2011 U.S. Dist. LEXIS 2615 (N.D. Ohio Jan. 11, 2011) ...................................33

*Dodge v. Cotter Corp.*,
   203 F.3d 1190 (10th Cir. 2000) ................................................... 19, 23, 26-27, 31

*Donaldson v. N. Trading Co.*,
   612 N.E.2d 754 (Ohio Ct. App. 1992)................................................................55

*Dopson-Troutt v. Novartis Pharm.*,
   2013 U.S. Dist. LEXIS 134904 (M.D. Fla. Sep. 20, 2013)................................31

*Dunson v. Cordis Corp.*,
   854 F.3d 551 (9th Cir. 2017) ..............................................................................23

*GE Med. Sys. Eur. v. Prometheus Health*,
   394 F. App'x 280 (6th Cir. 2010) .................................................................. 28-29

*Goodson v. McDonough Power Equip.*,
   443 N.E.2d 978 (Ohio 1983) ..............................................................................21

*Hardy v. Johns-Manville Sales Corp.*,
   681 F.2d 334 (5th Cir. 1982) ..............................................................................27

*Hicks v. De La Cruz*,
   369 N.E.2d 776 (Ohio 1977) ..............................................................................21

*Hughes v. Vanderbilt Univ.*,
   215 F.3d 543 (6th Cir. 2000) ..............................................................................53

*Knott v. Sullivan*,
   418 F.3d 561 (6th Cir. 2005) ..............................................................................19

*Laipply v. Bates*,
   849 N.E.2d 308 (Ohio Ct. App. 2006)................................................................51

*Leach v. E. I. DuPont de Nemours & Co.*,
   No. 01-C-608 (W. Va. Cir. Ct.) ............................................................................3

*Malcolm v. Nat'l Gypsum Co.*,
  995 F.2d 346 (2d Cir. 1993) ...............................................................32

*Marcus v. Rusk Heating & Cooling*,
  2013-Ohio-528 (Ct. App.) ...................................................................40

*Mussivand v. David*,
  45 Ohio St. 3d 314 (1989) .......................................................... 29-30

*In re Nat'l Prescription Opiate Litig.*,
  956 F.3d 838 (6th Cir. 2020) ...............................................16, 20, 28

*Nat'l Satellite Sports v. Eliadis, Inc.*,
  253 F.3d 900 (6th Cir. 2001) ...............................................................28

*O'Nesti v. DeBartolo Realty Corp.*,
  862 N.E.2d 803 (Ohio 2007) ...............................................................21

*Palsgraf v. Long Island R.R*,
  162 N.E. 99 (N.Y. 1928)........................................................................30

*Parklane Hosiery Co. v. Shore*,
  439 U.S. 322 (1979)........................................................ 19-22, 24, 32

*Pluck v. BP Oil Pipeline Co.*,
  640 F.3d 671 (6th Cir. 2011) ...............................................................39

*Rhodes v. E. I. Du Pont de Nemours & Co.*,
  253 F.R.D. 365 (S.D.W.V. 2008) .......................................................37

*Rhodes v. E.I. du Pont de Nemours & Co.*,
  636 F.3d 88 (4th Cir. 2011) .................................................................33

*In re Rhone-Poulenc Rorer Inc.*,
  51 F.3d 1293 (7th Cir. 1995) ...............................................................25

*Smelser v. Norfolk S. Ry.*,
  105 F.3d 299 (6th Cir. 1997) ...............................................................34

*Tamraz v. Lincoln Elec. Co.*,
  620 F.3d 665 (6th Cir. 2010) .......................................................48, 49

*Toledo v. Schmiedebusch*,
  949 N.E.2d 504 (Ohio 2011) ..............................................................54

*Twee Jonge Gezellen, Ltd. v. Owens-Illinois, Inc.*,
  238 F. App'x 159 (6th Cir. 2007) ......................................................50

*United Access Techs. v. CenturyTel Broadband Servs.*,
  778 F.3d 1327 (Fed. Cir. 2015) .........................................................25

*United States v. Stauffer Chem.*,
  464 U.S. 165 (1984)..................................................................... 28-29

*Estate of Van Dyke v. GlaxoSmithKline*,
  2006 U.S. Dist. LEXIS 114272 (D. Wyo. Nov. 1, 2006)...................28

*Yaceczko v. Roy*,
  2001 Ohio App. LEXIS 52 (Jan. 10, 2001) .......................................56

*Young v. Zukowski*,
  2010-Ohio-3491 (Ct. App, July 28, 2010).........................................18

**Statutes**

28 U.S.C. §1291 .........................................................................................2

Ohio Rev. Code §2305.10..........................................................49, 50, 56

Ohio Rev. Code §2315.18.............................................................. 32-33

**Other Authorities**

2 Toxic Torts Guide §13.07 (2019). .......................................................27

FJC, *Reference Manual on Scientific Evidence, Epidemiology* (3d. ed.
  2011) ..........................................................................................33, 48

Judge Fallon, *Bellwether Trials in Multidistrict Litig.*, 82 Tul. L. Rev.
  2323 (2008)........................................................................................23

## <u>STATEMENT IN SUPPORT OF ORAL ARGUMENT</u>

Defendant-Appellant E. I. du Pont de Nemours and Company ("DuPont") respectfully requests oral argument. This appeal presents the first-ever application of non-mutual, offensive collateral estoppel in personal-injury multidistrict litigation ("MDL") without prior notice or ensuring the first cases were representative of the cases being estopped. Nor did the court ensure that the outcome-determinative facts and actually-decided issues of earlier trials were identical to those in the Abbott trial.

The district court also excluded all evidence on the dose-response relationship between the chemical at issue and Plaintiff's cancers, allowing Plaintiff's experts to simply assume that the minimum exposure for class membership was sufficient to prove specific causation. The court also issued novel legal rulings on Ohio's statute of limitations, including a directed verdict for Plaintiff on the issue despite significant contrary evidence DuPont placed before the jury.

Oral argument is also important because the record spans more than 10,000 entries in the *Abbott*, *Swartz*,[1] and main MDL dockets. This Court's decision will impact numerous future cases that will be filed by some of the approximately 80,000 members of the *Leach* class. For that reason, if this Court reverses on collateral estoppel, DuPont respectfully requests that it still decide the remaining issues.

---

[1]The *Abbott-Swartz* trial involved two cases consolidated for trial. *Abbott* is on appeal from a judgment for Plaintiffs, but the jury deadlocked in *Swartz*.

## JURISDICTIONAL STATEMENT

The district court exercised diversity jurisdiction, as Plaintiffs are Ohio residents and DuPont is incorporated and has its principal place of business in Delaware.  Am. Compl., R.29, PageID204.[2]  Following entry of a clerk's judgment on April 7, 2020, Judgment, R.230, DuPont filed post-trial motions on April 24, 2020, Combined Motion, R.233, which the district court resolved on March 29, 2021.  Order, R.245; *see also* Stipulation, R.250.  The district court entered an amended judgment on April 26, 2021.  Am. Judgment, R.251.  DuPont timely noticed its appeal on April 27, 2021.  Notice of Appeal, R.262.  This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1.     Did the court below err by applying non-mutual offensive collateral estoppel in this MDL, without providing prior notice to the parties, where the potentially-outcome determinative issues across the cases are not identical, based on general verdicts from three prior individual cases with no findings on specific issues?

2.     Did the court err by excluding all expert testimony and evidence about the dose-response relationship between C8 and testicular cancer, and the amount of

---

[2] Unless otherwise noted, record citations are to the docket in *Abbott*, No. 2:17-cv-00998. Other dockets cited include the MDL (2:13-md-02433), *Swartz* (2:18-cv-00136), *Freeman* (2:13-cv-1103), *Vigneron* (2:13-cv-00136), *Bartlett* (2:13-cv-00170), the *Bartlett* Appeal (6th Cir. 16-3310), and the Mandamus Petition (6th Cir. 19-4226).  *See* Order, R.240, PageID12221 (clarifying scope of record).

Mr. Abbott's increased risk based on his specific C8 blood level, and by allowing his expert to assume specific causation based on class membership?

3.    Did the court err by taking the statute of limitations issue away from the jury, where DuPont presented extensive evidence Mr. Abbott had notice of the link between C8 and testicular cancer more than two years before filing suit?

## STATEMENT OF THE CASE

DuPont used C8 (perfluorooctanoic acid) as a processing aid to manufacture Teflon at a West Virginia plant until early 2013, and under environmental permits discharged C8 into the Ohio River and the air.  By 2006, DuPont was filtering local drinking water to remove C8.  Previously, trace amounts of C8 were present in different amounts in different nearby water districts.

In 2001, a class action in West Virginia state court, *Leach v. E. I. DuPont de Nemours & Co.*, No. 01-C-608, (W. Va. Cir. Ct.), alleged that C8 was dangerous, and may cause disease.  That class primarily sought medical monitoring, and the case was resolved in 2005 with a state-court approved settlement agreement (the "*Leach* Agreement," MDL R.2813-1, PageID45944). The class settlement benefits are ongoing for the life of the class, and include, among other things, an early medical screening program, and water treatment to remove C8 from public and private drinking water.

The settlement left open the possibility of individual personal-injury claims. Eventually thousands of class members filed individual lawsuits, claiming different exposures to C8 in different places ranging from the 1950s to 2007. Those lawsuits were centralized for pre-trial purposes into the C8 Personal Injury MDL.

## I.    The District Court's Ruling on Collateral Estoppel.

### A.    The court told the parties the early trials were meant to be instructive, but not preclusive.

From the outset of the MDL, DuPont confirmed with the court that the early trials would not create collateral estoppel. Transcript, MDL R.34, PageID218-19 ("Let me just make the record clear that we won't be committed to anything. We won't be collaterally estopped on any of the following cases."). The court agreed, holding "that its decisions are 'dispositive only on the claims' before it and 'instructive to claims filed by other plaintiffs.'" Order, MDL R.4184, PageID80083.

As the trials began, the court confirmed that the "special purpose" of the early trials was "information gathering that may lead to a global settlement." Order, MDL R.4382, PageID93365-66. In support, it quoted descriptions of other MDLs where "[t]he ultimate purpose of holding bellwether trials … was not to resolve the thousands of related cases pending in either MDL in one 'representative' proceeding." *Id.* (quoting Bellwether Trials, *infra*, at 2332).

When new cases were filed after the 2017 settlement of all then-pending cases, the court again stated that the parties could preserve previously decided issues for

future appeals: "My assumption is you don't want to be hamstrung to say that you can't reargue something…. I've never taken that view." Transcript, MDL R.5179, PageID125537-39. It acknowledged that DuPont was filing preservation motions "for the record, and those are always welcome so we'll continue that course." *Id.* It recognized the preservation of issues that were "litigated and adjudicated" in the prior cases: "any party may preserve for appeal their objections to one or more of the Court's prior rulings … by making a short filing." Order, MDL R.5188, PageID125608. DuPont continued to make numerous preservation filings. Notice of Preservation, *Swartz* R.92; Response *Swartz* R.66 ("DuPont continues to preserve, and does not waive, any of its arguments and positions … and incorporates by reference all current and prior relevant briefing and oral arguments in the MDL and the individual cases on these issues."); Motions, R.60, R.61, R.62 (parallel preservation motions in *Abbott*, incorporating *Swartz* filings).

> **B.** **The earlier trials involved significantly different facts and different negligence claims from the *Abbott-Swartz* trial.**

Early in the MDL, 20 cases were selected for discovery from the 80 then-pending MDL cases. Order, R.194, PageID3695. Six of the 20 were later chosen for bellwether trials. Order, MDL R.602, PageID9276.

The first bellwether jury awarded $1.6 million in compensatory damages on a kidney cancer claim, and found no punitive liability. Order, MDL R.5285, PageID128544. DuPont appealed. *See* 6th Cir. No. 16-3310. The second bellwether

settled, and the third was withdrawn by plaintiff.  The fourth, *Freeman*, resulted in $5.1 million in compensatory damages and $500,000 in punitive damages. Transcript, *Freeman* R.117, PageID3777.  The last two bellwethers settled.

Over DuPont's objection, the court then allowed plaintiffs' counsel to unilaterally select the next 40 cases for individual trials.  Transcript, MDL R.4461, PageID96026-31; Letter, MDL R.4535-3, PageID98589.  Plaintiffs successfully argued that "the representativeness of the trial selections should be of no moment," Letter, MDL R.4535-2, PageID98584, and selected their strongest cases (out of over 3,500).  The next trial (*Vigneron*) involved a plaintiff whose drinking water was sourced within 1,500 feet of DuPont's plant.

Those early cases presented different negligence claims from those in *Abbott*:

- Freeman and Vigneron alleged that DuPont should have known they were in danger because their drinking water exceeded DuPont's voluntary 3 ppb community safe exposure guideline for C8. Transcript, *Vigneron* R.144, PageID2801; Transcript, *Freeman* R.119, PageID4385.  In contrast, the *Abbott-Swartz* plaintiffs admitted their water was always below DuPont's safe exposure guideline—and they did not claim negligence based on violation of DuPont's internal guidelines.  Transcript, R.190, PageID8044.

- Freeman and Vigneron claimed negligence because DuPont knew there was C8 in their drinking water for over a decade before it warned them.  *See, e.g.*, Transcript, *Freeman* R.108, PageID1678-80.  The *Abbott-Swartz* plaintiffs conceded DuPont did not know there was any C8 in their water prior to it becoming widely and publicly known in 2001.  Transcript, R.188, PageID7684-85, 7692-93.

- Freeman and Vigneron alleged negligence based on their exposure from C8 air emissions, in addition to water emissions.  *See, e.g.*, Transcript, *Freeman* R.108,

PageID1842.  The *Abbott-Swartz* plaintiffs were not affected by air emissions. Transcript, R.186, PageID7384.

*See also* Mandamus Petition, R.1-2 at 20-25, (discussing important differences between *Abbott-Swartz* cases and earlier trials).

The general verdict in each prior trial focused on the specific plaintiff, and did not specify which acts or omissions of DuPont were negligent.  *See* Verdict, *Vigneron* R.176, PageID8220 ("Do you find in favor of Mr. Vigneron on his negligence claim?").  Each jury decided only whether DuPont breached a duty to someone *in that specific plaintiff's position*. Instructions, *Vigneron* R.195, PageID8617 (asking if DuPont should have "foreseen at the relevant time that injury was likely to result to someone in Mr. Vigneron's position").

The parties settled the thousands of then-pending MDL cases in February 2017.  The parties dismissed all pending cases, including a joint dismissal of the appeal from the first trial.  Dismissal Order, *Bartlett* R.164, PageID8361; Joint Motion to Dismiss, *Bartlett* Appeal R.41.

## C.    The district court then applied non-mutual, offensive collateral estoppel.

Additional cases, including *Abbott*, were filed soon after the February 2017 settlement.[3]  The new plaintiffs generally lived much farther away from DuPont's

---

[3] In January 2021, all then-pending cases in the MDL except *Abbott* were settled in a second multi-case settlement.  The Plaintiffs' Leadership Counsel subsequently filed a still-pending, unopposed motion (MDL R.5387) to terminate the MDL.

plant than the plaintiffs in the earlier trials, in areas where DuPont did not know that any C8 was present, and in areas that never exceeded DuPont's own guidelines for C8. Response, MDL R.5208, PageID125922-24, 125934-38 (discussing the makeup of the post-settlement MDL cases).

Before the *Abbott-Swartz* trial, however, despite these and other critical fact and issues differences, the court applied non-mutual, offensive collateral estoppel, and precluded DuPont from contesting the duty, breach, and foreseeability elements of negligence, along with certain rulings relating to causation and tort reform, for all current and future plaintiffs. Order, MDL R.5285, PageID128582, 128570-71. Granting summary judgment on these matters to Plaintiffs, the court ruled that only specific causation and damages remained for trial (and loss of consortium, where applicable). *Id.*, PageID128582.

DuPont sought a writ of mandamus. Mandamus Petition, R.1-2. This Court recognized that "DuPont has made a vigorous and perhaps compelling argument that the district court erred as a matter of law," but denied the extraordinary writ, and limited DuPont to a normal-course appeal. Order, Mandamus R.23-2 at 5.

## II.    The Trial Court's Rulings on Specific Causation.

### A.    The *Leach* Agreement created a Science Panel to study C8 and human disease.

The *Leach* Agreement provided that DuPont would pay up to $235 million for medical monitoring for a broad settlement class including anyone who drank water

"containing a *quantifiable* (greater than or equal to .05 ppb) amount of C8" from certain areas for "at least one year."    *Leach* Agreement, MDL R.2813-1, PageID45928 (emphasis added).  The class definition is the only place in the *Leach* Agreement that refers to the .05 ppb value, which modifies the word "quantifiable." *Id*.  The .05 ppb threshold was the "minimum" concentration of C8 that scientists could quantify "with known precision and accuracy" in 2004, when the *Leach* Agreement was signed. *Id.*; Transcript, R.190, PageID8041.

The *Leach* Agreement asked three epidemiologists, called the "Science Panel," to determine whether a "Probable Link" existed between C8 and various diseases.  *Leach* Agreement §12.2.3, MDL R.2813-1, PageID45944-46.  "Probable Link" is a term of West Virginia law, defined in the *Leach* Agreement as "it is more likely than not that there is a link between exposure to C8 and a particular Human Disease among Class Members."    *Id*., §1.49, PageID45926-27.   The *Leach* agreement (at §1.6) refers to *Bower v. Westinghouse Elec.*, 522 S.E.2d 424, 433-33 (W.V. 1999), which explained that a "probable link" means there is "an enhanced risk of disease" but not that disease "is certain or even likely to occur as a result of exposure."  As counsel for the *Leach* class told the Science Panel, the "more lenient 'probable link' standard" is "a lower standard of proof" than would be required for "a finding of causation."  Letter, MDL R.2813-2, PageID46004-05.

The *Leach* Agreement allowed for the possibility of future individual personal injury claims, but made important distinctions between general and specific causation. DuPont agreed it would "not contest the issue of General Causation between C-8" and testicular cancer (or any other disease) for which the Science Panel made "a Probable Link Finding." *Leach* Agreement, §3.3, MDL R.2813-1, PageID45931-32. In the same sentence, however, *Leach* class members agreed that DuPont fully preserved its right to contest "Specific Causation." *Id*. The agreement defines General Causation in terms of *diseases*, *id.*, §1.25, PageID45925 (whether "it is probable that exposure to C-8 is capable of causing a particular human disease"), but defines Specific Causation in terms of *individuals*, *id.*, §1.60, PageID45927 (whether "it is probable that exposure to C-8 caused a particular human disease in a specific individual").

**B.    The Science Panel found that the amount of risk of getting testicular cancer increases with substantially increased cumulative blood levels of C8.**

The Science Panel spent seven years reviewing the science on C8 and conducting its own epidemiological studies, which included assessing information collected from people in communities around the DuPont plant. In its 2012 report on cancer, the Science Panel found a "Probable Link" between C8 and testicular cancer, in part because the data showed that residents with higher cumulative C8 blood levels had a greater cancer risk than other residents with lower C8 blood levels.

Science Panel Report, MDL R.2813-4, PageID46017, 46019.  The Science Panel studied the amount of "relative" risk for different C8 blood levels.  The risk was highest in Little Hocking, "the most highly exposed water district," where Mr. Vigneron and Mr. Freeman (but not Mr. Abbott) obtained their water.  *Id.*, PageID46013-14.

For example, in one of their studies, the Science Panel concluded that any materially increased risk of testicular cancer in the *Leach* class members from C8 was limited to people in the "very high exposure category."  Science Panel Publication, R.259-1, PageID18432.  The Science Panel data showed that people like Mr. Abbott, in the "high, medium, or low exposure categories" (C8 blood levels between 3.7 to 109 ppb (µg/L)) had no increased risk for testicular cancer from C8. *Id.*, PageID18433.  The data showed that people in those exposure categories had adjusted odds ratios ("AORs") of 0.3, 0.6, and 0.2, respectively, meaning that they had no increased risk.  *Id.*

**Table 2.** OH serum-level results: *n* and AORs (95% CIs) for individual-level annual PFOA serum exposure categories assuming 10-year residency and latency.

| Cancer outcome | Total | Total exposed | Very high | | High | | Medium | | Low | |
|---|---|---|---|---|---|---|---|---|---|---|
| | *n* | *n* | *n* | AOR (CI) | *n* | AOR (CI) | *n* | AOR (CI) | *n* | AOR (CI) |
| Testis | 61 | 11 | 6 | 2.8 (0.8, 9.2) | 1 | 0.3 (0.0, 2.7) | 3 | 0.6 (0.2, 2.2) | 1 | 0.2 (0.0, 1.6) |

Adjusted for age, race, sex, diagnosis year, insurance provider, and smoking status; controls were other listed cancers excluding kidney, liver, pancreas, and testis cancers. Categories of modeled PFOA serum concentrations: very high = 110–655 µg/L; high = 30.8–109 µg/L; medium = 12.9–30.7 µg/L; low = 3.7–12.8 µg/L; reference = unexposed.

*Id.* (other cancers removed; red boxes added; an AOR needs to be above 1.0 for the data to show an increased risk from C8).

Mr. Abbott had a C8 blood level of 33.1 ppb (µg/L) in 2006, *see* Transcript, R.190, PageID7964, much lower than the "very high" category (those above 110 ppb (µg/L)) for which the Science Panel's publications found an AOR over 1.0, which could indicate an increased risk of testicular cancer. Science Panel Publication, R.259-1, PageID18432-34.

The Science Panel did <u>not</u> determine that the minimum quantifiable amount of C8, .05 ppb, was meaningful in terms of outcomes, or that testicular cancer was likely to occur at that exposure level. Science Panel Report, MDL R.2813-4, PageID46017. The .05 ppb number was never mentioned in its report. *See* Transcript, R.261-2, PageID20038 (Mr. Abbott's causation expert admitting in a proffer that the Science Panel "did not conclude as a matter of science that .05 parts per billion of C8 in drinking water is capable of causing testicular cancer").

**C.    The court excluded all expert questioning and evidence on Mr. Abbott's amount of increased risk of cancer based on his individual dose of C8, and excluded all affirmative specific causation opinions by DuPont's experts.**

Despite the Science Panel's findings that the risk of cancer varied with different C8 blood levels, the court ruled that DuPont could not contest that C8 was a likely cause of Mr. Abbott's testicular cancer. Order, MDL R.5214, PageID126051 ("The Probable Link Finding means that … it is more likely than not that there is a link between <u>his</u> or her exposure to C8 … and <u>his</u> or her" disease) (emphasis added). It held that expert opinions on the dose-response relationship

between C8 and testicular cancer would be misleading because "the whole point of the Science Panel was that very low doses of this is dangerous."  Transcript, R.261-2, PageID20002.

Accordingly, the court held that Mr. Abbott's class membership alone (*i.e.,* exposure to .05 ppb of C8 for one year) was sufficient to prove that C8 was a likely cause of his cancer.  *See* Order, MDL R.4113, PageID78030 (exposure to .05 ppb sufficed to show that "it is more likely than not that there is a link between that class member's exposure to C8 and his" disease) (emphasis added); *see also* Order, MDL R.3972, PageID68171 (plaintiff need not prove "her dose" of C8 because proving class membership at .05 ppb is enough to prove "it is 'more likely than not that there is a link between exposure to C-8 and her kidney cancer") (emphasis added).

Based on those rulings, the court made several key decisions that controlled the expert opinions and evidence the jury was allowed to hear:

(a)  The court barred DuPont's experts from opining that C8 was not a likely cause of Mr. Abbott's cancers, believing that such opinions violated DuPont's agreement not to contest general causation.  Order, MDL R.5294, PageID128746 (excluding DuPont's specific causation experts); Order, R.107, PageID3815.  Specifically, it excluded: 1) any expert "analysis" calculating the amount of "increased risk" to Mr. Abbott based on his individual dose of C8; 2) any opinion that Mr. Abbott's specific exposure to C8 created "only a small" or "a 10% increased

13

likelihood" of developing cancer; and 3) any claim that C8 was not a "significant contributing factor" to Mr. Abbott's cancer. *See, e.g.,* Order, R.125, PageID4406-08; Order, *Swartz* R.135, PageID4574-78. The court also prevented DuPont's specific causation expert from opining that a well-established testicular cancer risk factor, Germ Cell Neoplasia In Situ ("GCNIS"), was more likely to have caused Mr. Abbott's cancer than C8. Order, R.125, PageID4406-08. It also forbade DuPont experts from opining that a class member's cancer was more likely caused by other (non-C8) factors, or that "minimal exposure to C8" creates a minimal increased risk of cancer. Order, MDL R.4226, PageID81632-35; Order, MDL R.4079, PageID71855 (same).

(b)   The court allowed Plaintiffs' experts to rely solely on its rulings about the Science Panel to opine that C8 caused Mr. Abbott's testicular cancers, freeing them from the need to "evaluate the relative risk of C8 causing testicular cancer in this case." Transcript, R.195, PageID8842-43. For example, Mr. Abbott's specific causation expert never determined Mr. Abbott's C8 dose, and never evaluated Mr. Abbott's level of increased risk of cancer from his C8 blood level, but instead "determined that he had a sufficient level of exposure to C8 to cause his testicular cancers" for no other reason than because Mr. Abbott "met the definition of a class member." Transcript, R.261-2, PageID19999.

(c)   The court kept the Science Panel's Report and data from the jury, even while allowing Plaintiffs' expert to use it to bolster his testimony, and even after the jury specifically asked to see the report.  *See infra* pp. 39-40; Transcripts, R.207, PageID11169; R.200, PageID9805-06 (rejecting DuPont's proffer of the Science Panel's Report and data); PageID9459 (same); Trial Proffer, R.261-2, PageID20038, 20045-49 (proffer regarding Science Panel).  Instead, over DuPont's objection, the court instructed the jurors that .05 ppb was "the Science Panel's threshold" and that the number was relevant to their decision on causation.  Transcripts, R.185, PageID7139; R.203, PageID10347 (instructing jurors the Science Panel "linked" the .05 ppb number to testicular cancer); R.193, PageID8434 (same).  The court also excluded any substantive evidence on the Science Panel's discussion of the dose-response relationship.  The court forbade any expert testimony or cross-examination about "the content of the Science Panel's analysis in reaching its Probable Link Finding related to testicular cancer."  Order, MDL R.4777, PageID108894.  It also rejected DuPont's requests for an instruction that the "0.05 ppb number has nothing to do with the specific causation issue that you need to decide."  Limiting Instruction Request, R.164-3, PageID6289.

## III.   The *Abbott-Swartz* consolidated trial.

The jury awarded Mr. Abbott, who had two testicular cancers (in 1994 and 2015) $40 million in damages, and Mrs. Abbott $10 million for loss of consortium.

Verdict, R.183.  The jury rejected punitive damages, and failed to reach a verdict in *Swartz*.  *Id*.; *Swartz* R.190. After trial, DuPont moved for application of the Ohio Tort Reform Act to Mrs. Abbott's loss of consortium award, which the court granted. Order, R.245, PageID12355.  DuPont also moved for remittitur, which the court denied.  *Id.*, PageID12356.

## SUMMARY OF ARGUMENT

Three issues require reversal and remand:

1.    The court's unprecedented application of non-mutual, offensive collateral estoppel stripped DuPont of important negligence defenses at the *Abbott-Swartz* trial and all future trials, violating DuPont's right to due process.  The ruling was based on three unrepresentative early trials (out of 3,500 cases) that were not supposed to be preclusive and resulted in general verdicts only.   Order, MDL R.4184, PageID80083.  The court erred by disregarding Sixth Circuit precedent that "offensive collateral estoppel c[annot] be used in mass tort litigation," *In re Bendectin Prod. Liab. Litig.*, 749 F.2d 300, 305 n.11 (6th Cir. 1984), and by ignoring black-letter law that previous "actually" decided issues must be "identical" to those in the current case, *CHKRS, LLC v. Dublin*, 984 F.3d 483, 491 (6th Cir. 2021).  *See In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 844 (6th Cir. 2020) ("MDLs are not some kind of judicial border country, where the rules are few and the law rarely makes an appearance.").

16

Here, two early trial plaintiffs drank water sourced from wells only 1/4 mile from DuPont's plant; claimed DuPont knew their water contained C8 for more than 15 years but failed to warn them; and claimed the C8 levels in their water exceeded DuPont's own safety guidelines. In contrast, Mr. Abbott drank water sourced from wells 14 to 56 miles away from DuPont's plant; did <u>not</u> claim DuPont knew his water contained <u>any</u> C8; and admitted his C8 exposure was always below DuPont's safety guidelines. These material fact differences are critical to whether DuPont was negligent towards Mr. Abbott. The court erred when it took key issues from the jury based on three general verdicts from non-representative individual trials.

2.      In the *Leach* Agreement, DuPont contractually promised not to contest *general* causation (that C8 is capable of causing testicular cancer). Class members like Mr. Abbott, however, agreed that DuPont fully preserved *specific* causation defenses (whether C8 more likely than not caused Mr. Abbott's testicular cancer). Ruling that any inquiry into the dose-response relationship or weighing Mr. Abbott's relative risk from his specific C8 blood level would be an attack on general causation, the court gutted DuPont's right to contest specific causation by:

- excluding all evidence regarding the dose-response relationship between C8 and Mr. Abbott's disease (including Mr. Abbott's specific amount of increased risk from his C8 blood level);

- instructing the jury (contrary to the actual science) that the barely-quantifiable level of .05 ppb of C8 was sufficient to likely cause Mr. Abbott's cancer;

- allowing Mr. Abbott's expert to assume that C8 likely caused Mr. Abbott's cancer based on his class membership, instead of his specific dose, or risk; and

- barring any expert opinions that Mr. Abbott's cancer was not specifically caused by C8, and instead was more likely caused by something else.

In short, the district court interpreted DuPont's agreement not to contest *general* causation to preclude critical facts and argument applicable to *specific* causation.

3.      The court removed from the jury DuPont's statute of limitations defense regarding Mr. Abbott's 1994 and 2015 testicular cancers, despite copious evidence that any reasonable person in Mr. Abbott's position would be on notice of the potential link between C8 and testicular cancer more than two years before his 2017 complaint.[4]

## **ARGUMENT**

### **I.    The District Court Improperly Applied Non-Mutual, Offensive Collateral Estoppel to Take Plaintiff-Specific Issues Away From the Jury.**

The court's application of non-mutual, offensive issue preclusion in this mass tort MDL improperly relieved Plaintiffs from proving fundamental elements of their case.  The court used plaintiff-specific verdicts from three early MDL trials to decide the duty, breach, and foreseeability elements of negligence claims brought by other

---

[4] Reversal of Mr. Abbott's claim also requires reversal of Mrs. Abbott's derivative claim for loss of consortium.  *See, e.g.*, *Young v. Zukowski*, 2010-Ohio-3491, ¶13 (Ct. App, July 28, 2010) (holding loss of consortium is "a derivative action" whose existence is "dependent upon the existence of a primary cause of action and can be maintained only so long as the primary action continues").

plaintiffs with quite different circumstances. Preclusion Order, MDL R.5285, PageID128531. On mandamus review, this Court noted: "DuPont has made a vigorous and perhaps compelling argument that the district court erred as a matter of law." Mandamus R.23-2 at 5. On *de novo* review, and placing the burden on Plaintiffs to establish that preclusion applies, this Court should vacate the preclusion order and remand for a new trial. *See Abbott v. Michigan*, 474 F.3d 324, 331 (6th Cir. 2007); *Knott v. Sullivan*, 418 F.3d 561, 568 (6th Cir. 2005).

In this Circuit, offensive issue preclusion is not available "in mass tort litigation." *Bendectin*, 749 F.2d at 305 n.11 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330 n.14 (1979)). Indeed, courts and commentators universally agree that collateral estoppel is a dangerous tool for an MDL court and, if used at all, at least requires both statistically representative cases and prior notice. *See In re Chevron U.S.A.*, 109 F.3d 1016, 1020 (5th Cir. 1997); *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1200 (10th Cir. 2000). Applying preclusion in an MDL goes only one way—against defendants. It is unfairly prejudicial and a denial of due process to use general verdicts from three individual cases to prove the individual claims of thousands of other, differently-situated plaintiffs in an MDL. It is especially unfair for the court to reverse course and apply preclusion from prior verdicts and rulings despite assurances that its decisions would be non-binding in future cases. Order, MDL R.4184, PageID80083; Order, MDL R.4382, PageID93365-66.

The court's application of offensive preclusion failed basic requirements of preclusion law.  As this Court recently emphasized, an MDL court must respect "the parties' rights in an individual case" and cannot "distort or disregard the rules of law applicable to each of those cases."  *Nat'l Prescription Opiate Litig.*, 956 F.3d at 841.  "[E]nhancing the efficiency of the MDL as a whole" is no reason to disregard "the same legal rules that apply in other cases."  *Id.* at 841, 844.  The court did not follow those "same legal rules," instead imposing estoppel based on a "community" theory of negligence, Preclusion Order, MDL R.5285, PageID128574-75, despite numerous potentially outcome-determinative differences between Mr. Abbott and the earlier trial plaintiffs.

### A.    Ordering preclusion without notice or representative cases was unfairly prejudicial, and deprived DuPont of due process.

In *Parklane Hosiery*, the Supreme Court forbade "the use of offensive collateral estoppel" where it "would be unfair to a defendant."  439 U.S. at 330-31 & 347 n.14.  It worried about situations like this case, where unrepresentative trials control later-filed cases with different facts and issues.  *See id.*  Applying *Parklane* in a mass tort case, this Court held that "offensive collateral estoppel c[annot] be used in mass tort litigation."  *Bendectin*, 749 F.2d at 305 n.11.

Ohio law also generally forbids non-mutual, offensive preclusion, and no Ohio court has allowed it in these circumstances.[5]  While the estoppel consequences of the first case are a matter of federal law that incorporates state law, the district court concluded that federal law is unshackled from state law due to an interest in national uniformity and MDL practice.  Order, MDL R.5285, PageID128557 (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001)).

The court's decision, however, was contrary to both this Court's precedent and the decisions of every other circuit to address the issue.  For example, in *Bendectin* the lower court had certified a mass tort class action due to its belief that, if the cases proceeded as individual actions (as they typically do in MDLs), estoppel would "bind the defendant on issues of liability if any plaintiff were to win a suit against it."  749 F.2d at 305.  This Court disagreed, and noted that the "concern" about mass tort estoppel "has been eliminated by the Supreme Court's curtailment of the use of offensive collateral estoppel in" *Parklane Hosiery.  Id.*  The application

---

[5]The Order was wrong under both Ohio and federal law.  The court concluded that Ohio law also supported application of preclusion.  Order, MDL R.5285, PageID128564.  But DuPont is unaware of any modern Ohio case applying non-mutual, offensive preclusion.  The case cited by the district court, *id.,* PageID128566, *Goodson v. McDonough Power Equip.*, 443 N.E.2d 978 (Ohio 1983), affirmed Ohio's general rule <u>against</u> non-mutual, offensive preclusion, and limited an old case applying offensive estoppel to its facts (*Hicks v. De La Cruz*, 369 N.E.2d 776 (Ohio 1977)).  And there is no mutuality here, as required by Ohio law.  *Contrast* Order, PageID128566, *with O'Nesti v. DeBartolo Realty*, 862 N.E.2d 803, 806 (Ohio 2007) ("Mutuality … exists only if 'the person taking advantage of the judgment would have been bound by it had the result been the opposite.'").

of *Parklane Hosiery* was thus essential to *Bendectin's* holding, and not mere *dicta*, as the district court believed. *See* Order, MDL R.5285, PageID128563. *See also In re Air Crash Disaster at Stapleton Int'l Airport*, 720 F. Supp. 1505, 1533 (D. Colo. 1989) (binding present and future MDL cases "to the verdicts of the exemplar trial …. would be clearly beyond the powers of this court," and noting that an MDL court cannot "create broad new powers, inconsistent with established legal principles").

No circuit court has *ever* allowed an MDL court to make bellwether trial results preclusive on all the other individual cases in an MDL. Even the few decisions from other jurisdictions suggesting preclusion *could* potentially apply to an MDL have required due process safeguards: At the least, there must be advance notice that the bellwethers could be preclusive, and the bellwethers must be selected to present a statistically representative sample of all the cases.

In *Chevron*, 109 F.3d at 1020-21, the district court planned to try 30 of 3,000 MDL cases, with each side selecting 15 cases. *Id*. The trial would be preclusive on both "general liability" and "general causation" for all 3,000 cases. *Id.* The Fifth Circuit rejected this plan for lacking "the minimal level of reliability necessary for the imposition of such liability" without a sufficient number of trials to be statistically representative. *Id.* at 1020. Here, neither of the two bellwether trials were statistically representative of the thousands of other individual plaintiff claims, and neither was representative of Mr. Abbott's case. And the court recognized that

22

the third trial, *Vigneron*, was not chosen to be representative.  Transcript, MDL
R.4461, PageID96026-27.

In addition, the Tenth Circuit has forbidden collateral estoppel in toxic tort
cases without prior notice and express agreement of the parties. *Dodge*, 203 F.3d at
1200 ("If the parties intended to bind subsequent litigation with the results of prior
test trials, the record must clearly memorialize that agreement.").  *See* Judge Fallon,
*Bellwether Trials in Multidistrict Litig.*, 82 Tul. L. Rev. 2323, 2331-32 & n.26-27
(2008) (bellwethers should not "somehow have a binding effect" and "the results of
bellwether trials are not properly binding on related claimants unless those claimants
expressly agree to be bound by the bellwether proceedings") (collecting authority).

In contrast, the court and the parties here agreed throughout the earlier stages
of the MDL that the early trials and rulings would be "dispositive" only as to
individual plaintiffs, and merely "instructive to claims filed by other plaintiffs."
Order, MDL R.4184, PageID80083; Order MDL R.4624, PageID100947 (purpose
was "information gathering" not a "'representative' proceeding"); *see supra* at pp.
4-5; *see Dunson v. Cordis Corp*., 854 F.3d 551, 555 (9th Cir. 2017) ("when plaintiffs
propose a bellwether trial …, we presume that they mean a bellwether trial in which
the results will not be binding … but will instead be used for informational purposes
only").  The court later reiterated that it had "never taken th[e] view" that DuPont
could not contest prior rulings, that DuPont "had the right" to argue prior issues in

"a different case," and that "we'll continue that course." Transcript, MDL R.5179, PageID125537-39. The court's representations that bellwethers were meant for information-gathering, and that its rulings could be challenged in future individual cases, made preclusion particularly unfair. *See Parklane*, 439 U.S. at 331 (offensive estoppel not allowed where "unfair to a defendant").

The only judicial decision the court cites as binding parties to a bellwether verdict was careful to emphasize "the notice all parties had going into the bellwether trial as to what issues might be accorded preclusive effect," including that liability findings would "almost certainly be given preclusive effect." *Adams v. United States*, 2010 U.S. Dist. LEXIS 116052, *11, 13 (D. Idaho Oct. 29, 2010). That court also used a 47-question special verdict with detailed findings to avoid ambiguity on the specific issues being decided. *Id.*, *16. In contrast, here, not only was there no prior notice or agreement, but the general verdict forms used in the early trials only asked if DuPont was negligent *as to that specific plaintiff*.

Had DuPont known the early trials would be preclusive, its strategy in selecting, trying, and settling bellwethers would have been different, resulting in cases more representative of the MDL as a whole. DuPont also would have requested detailed special verdicts in all trials, including the non-bellwether *Vigneron* that Plaintiffs' were allowed to cherry-pick, to clarify what the jury was

(and was not) deciding.  Instead, DuPont was assured that rulings, findings, and outcomes in early trials were binding as to those specific plaintiff's cases only.

More broadly for trial practice in this Circuit, the court's preclusion order makes the MDL bellwether process a no-win proposition for defendants:  early trial victories for the defendant would not bind future plaintiffs, but early losses make the defendant negligent to all plaintiffs in the queue—regardless of the different fact situations of different plaintiffs.  This unfairly tilted playing field threatens extortionate and unfair settlement pressure on defendants.  *See In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1305 (7th Cir. 1995) (reversing to prevent "intense pressure to settle" prior to an involuntary single trial on mass tort liability); *Chevron*, 109 F.3d at 1017, 1022 (Jones, J. concurring) (the extraordinary "pressure on the parties to settle" an "all-or-nothing" bellwether trial would violate due process).

### B.     The plaintiff-specific verdicts in the prior trials should not have been given preclusive effect in the *Abbott-Swartz* trial.

The plaintiff-specific general verdict forms and related jury instructions from the early trials also prevent preclusion.  It is well-settled that, "[w]hen there are several possible grounds on which a jury could have based its general verdict and the record does not make clear which ground the jury relied on, collateral estoppel does not attach to any of the possible theories."  *United Access Techs. v. CenturyTel Broadband Servs.*, 778 F.3d 1327, 1331 (Fed. Cir. 2015).  The jurors in the three prior trials found that DuPont was negligent with respect to three individual

plaintiffs—not anyone else.  For example, in *Freeman*, the negligence instruction required jurors to find that a reasonable person "would have foreseen at the relevant time that injury was likely to result <u>to someone in Mr. Freeman's position</u>."  Jury Instructions, *Freeman* R.102, PageID1050 (emphasis added); *see* Instructions, *Vigneron* R.195, PageID8617 (same); Instructions, *Bartlett* R.139, PageID6205 (same).  Each verdict form required a finding about someone <u>in the position of that individual plaintiff</u>.  Verdict, *Freeman* R.97, PageID1011 ("Do you find in favor of Mr. Freeman on his negligence claim.").  The juries did not decide other issues or identify the basis for their general verdicts.

The court bypassed the individual differences in the cases by erroneously claiming that the prior "verdicts made clear that the duty DuPont breached was to the <u>entire communities</u> surrounding its Washington Works plant and not just to specific customers of individual water districts."  Order, MDL R.5285, PageID128574-75 (emphasis added).  Based on this reasoning, the court repeatedly instructed the jury that negligence was already determined for the *Abbott-Swartz* trial plaintiffs.  *See, e.g.* Transcripts, R.186, PageID7194; R.193, PageID8385-86; R.207, PageID11148.  This was error.

Courts uniformly reject attempts to use general negligence verdicts to create community-wide preclusion for other plaintiffs.  For example, *Dodge*, 203 F.3d at 1192, 1198, involved hundreds of plaintiffs, decades of operations, and nearly a

dozen theories of negligence, including failure to test and failure to train employees. An earlier jury returned a general verdict of negligence. *Id.* The Tenth Circuit reversed the lower court's application of collateral estoppel to later plaintiffs in part because the original verdict did not "specify what negligent act formed the basis of the general finding of negligence" making it "not possible to know the compass of the [prior] jury's finding of negligence." *Id.* at 1197-98.

Similarly, in *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 343-44 (5th Cir. 1982), a first jury found liability for failure to warn, but the Fifth Circuit refused preclusion in a later case because the verdict was "ambiguous as to certain key issues," including "what the [first jury] decided about when a duty to warn attached." *Id.* at 343-44. Commentators agree that preclusion cannot apply in mass torts where there is "substantial ambiguity regarding the meaning of the prior judgment." 2 Toxic Torts Guide §13.07 (2019). *See also Black v. Ryder/P.I.E. Nationwide*, 15 F.3d 573, 581-82 (6th Cir. 1994) (clear error where court "engage[d] in pure speculation regarding the basis for the general verdict in the earlier case").

**C.    The court disregarded outcome-determinative fact differences among the plaintiffs, and applied preclusion to non-identical and non-essential issues that were not actually decided.**

The *Abbott-Swartz* trial involved many potentially outcome determinative plaintiff-specific differences from the earlier trials, including DuPont's knowledge about which locations had any levels of C8, different levels of C8 in different places

over time (including whether the levels were above or below DuPont's own guideline), and developments in the science of C8 over time—all of which rendered preclusion improper. *Estate of Van Dyke v. GlaxoSmithKline*, 2006 U.S. Dist. LEXIS 114272, *11-14 (D. Wyo. Nov. 1, 2006) (collateral estoppel did not apply where each case involves "different facts, doses, time frames, diagnoses, warnings and research"). Each of the three early trial plaintiffs emphasized individual circumstances, such as location and timing, to show that DuPont had a duty and breached it, resulting in foreseeable harm—contrary to the court's statement that plaintiff-specific evidence is only relevant to specific causation. *Compare* Transcripts, *Freeman* R.133, PageID1842-43; *Bartlett* R.145, PageID6315-16; *Vigneron* R.188, PageID8269-70, *with* Order, MDL R.5285, PageID128575-74.

An MDL court is not free to disregard black-letter requirements: "The law governs an MDL court's decisions just as it does a court's decisions in any other case." *Opiate Litig.*, 956 F.3d at 844. Collateral estoppel requires that the prior case "actually" decided "the precise issue," *Nat'l Satellite Sports v. Eliadis, Inc.*, 253 F.3d 900, 908 (6th Cir. 2001) (quotations omitted), and that the issue's "resolution was essential to the judgment," *CHKRS*, 984 F.3d at 491. Close is not enough—the "actually" determined issues must be "identical." *Id.*; *GE Med. Sys. Eur. v. Prometheus Health*, 394 F. App'x 280, 283 (6th Cir. 2010); *United States v. Stauffer Chem.*, 464 U.S. 165, 172 (1984) (preclusion applies where the factual differences

between cases were "of no legal significance whatever in resolving the issue presented").

Here, an important factor in the earlier *Freeman* and *Vigneron* trials was each plaintiff's claim that DuPont knew for more than 15 years that their drinking water contained C8 without telling them, even though the amount of C8 sometimes exceeded DuPont's safe exposure guideline. *See, e.g.,* Transcript, *Freeman* R.108, PageID1678-80 (testimony that DuPont did not disclose C8 in their water until 2002 despite knowledge in 1984). One of the early trial plaintiffs also claimed he personally was "reassured" by DuPont that his drinking water was safe. Transcript, *Freeman* R.133, PageID7673-74. Unlike Mr. Abbott, those plaintiffs lived near DuPont's plant, and drank water sourced from wells just 1,500 feet from the plant. Also unlike Mr. Abbott, they lived downwind and close enough to claim C8 exposure from air emissions, and claimed DuPont was negligent for not using incineration for air emissions. Transcripts, *Vigneron* R.141, PageID2130; *Freeman* R.107, PageID1516-17.

The proximity of a plaintiff to the source of emissions bears heavily on the issues of duty, breach, and foreseeability. *See Allen v. Verson Allsteel Press*, 957 F.2d 275, 276-77 (6th Cir. 1992) ("the injury occurred in a location where it was not foreseeable that anyone would be injured, since that location was too far removed from the ground to present any danger"); *Mussivand v. David*, 45 Ohio St. 3d 314,

29

320-21 (1989) ("The existence of a duty will depend on the foreseeability of the injury to appellee."); *Palsgraf v. Long Island R.R.*, 162 N.E. 99, 100-01 (N.Y. 1928) ("The risk reasonably to be perceived defines the duty to be obeyed…. [A plaintiff] must show that the act *as to him* had possibilities of danger so many and apparent as to entitle him to be protected.") (emphasis added).

In contrast to the *Freeman* and *Vigneron* plaintiffs, the *Abbott-Swartz* plaintiffs lived more than 20 miles away from DuPont's plant, making their injuries less foreseeable. Mr. Abbott's water was drawn from wells that were roughly 50 and 200 times farther away downriver from DuPont's plant than Freeman's and Vigneron's wells. Transcript, R.192, PageID8292 (Abbott's water was sourced from wells 14 and 56 river-miles away—compared to ¼ mile for Freeman and Vigneron); Exhibit, R.254-3, PageID14012. Mrs. Swartz lived outside the impacted water districts, and claimed exposure from occasionally drinking water when visiting the homes of others and during a brief part-time job. *See* Am. Compl., *Swartz* R.15; Response, MDL R.5278, PageID128443-44; Expert Report, *Swartz* R.51-10, PageID1411.

Also, Mr. Abbott did <u>not</u> claim DuPont knew there was <u>any</u> C8 in his water, and did not claim air emission exposure (he lived <u>up</u>wind from the plant, and his water wells were also upwind). Transcript, R.186, PageID7384. Mr. Abbott's primary liability expert conceded that DuPont did <u>not</u> know—and therefore had no

30

duty to warn—about C8 in Mr. Abbott's drinking water.  Transcript, R.188, PageID7684-85, 7692-93.  Mr. Abbott's experts also conceded that the C8 levels in his water <u>never</u> exceeded DuPont's voluntary safe exposure guideline.  Transcript, R.190, PageID7940, 8044 (DuPont's water guideline was 3 ppb, and Mr. Abbott's exposure was always below 1 ppb).  Those differences are crucial to the issues of duty, breach, and foreseeability. Particularly because it was undisputed that DuPont did not know that C8 levels below 1 ppb could cause harm, Transcript, R.188, PageID7704-05, and no studies showed adverse health effects from exposure to C8 at even 50 ppb.  *Id.* PageID7727-28.

Similarly, timing is crucial in toxic tort cases where the facts span decades. Here, individual plaintiffs were exposed to C8 at widely different times, and DuPont's own knowledge about C8, the state of general scientific knowledge, and DuPont's actions to address C8 all evolved greatly over time.  *See Dodge*, 203 F.3d at 1198-99 (negligence issues in two cases were not identical, because the time frames relevant to each case were different); *Dopson-Troutt v. Novartis Pharm.*, 2013 U.S. Dist. LEXIS 134904, *5 (M.D. Fla. Sep. 20, 2013) (no issue preclusion in toxic exposure case because "the scientific knowledge relevant in [the second case] and the other plaintiffs' trials would be different").  As the years pass and new cases are filed, these differences will compound further.

The jury, not the court, should have decided whether it was reasonably foreseeable to DuPont that injury was likely to a person in the specific position of Mr. Abbott. *See Malcolm v. Nat'l Gypsum Co*., 995 F.2d 346, 350 (2d Cir. 1993) ("The systemic urge to aggregate litigation must not be allowed to trump our dedication to individual justice.").

### D.    The court should not have applied preclusion regarding the Ohio Tort Reform Act.

Plaintiff-specific differences are also critical under Ohio's Tort Reform Act, O.R.C. §2315.18, which provides a recovery limit for certain types of damages. The court ruled that DuPont was collaterally estopped from "relitigating" the "application of the Ohio Tort Reform Act." Order, MDL R.5285, PageID128554. As a result, it stated that "the relevant date for determining whether the [Ohio Tort Reform Act] applies is the date the conduct giving rise to the plaintiff's cause of action occurred." Order, R.245, PageID12331 (holding the Act did not apply to Mr. Abbott).

Preclusion cannot apply because the court's prior decisions on the issue were inconsistent. *See Parklane*, 439 U.S. at 330-31 (noting unfairness in estoppel where prior decisions are inconsistent). Conflicting with the "date of conduct" analysis noted in *Abbott*, the court previously held that the application of the Tort Reform Act "depends on whether the initial injury took place before" the Act's 2005 effective date. Order, MDL R.4215, PageID81292. This matters, because the early

trial plaintiffs were all injured long before 2005, and the court therefore "determined that the Tort Reform Act does not apply."  Order, MDL R.5285, PageID128541, 128569-70.  By contrast, the new plaintiffs were injured long *after 2005*, including Mr. Abbott (as to his second cancer in 2015).[6]

The date of a plaintiff's injury controls the application of §2315.18.  *See Coffey v. Smith & Wesson*, 2011 U.S. Dist. LEXIS 2615, *6 (N.D. Ohio Jan. 11, 2011) (collecting cases).  The Order ignores the difference between the prior and current plaintiffs as to timing of their injuries, and eliminates the right to a jury trial on whether damage cap exclusions apply.

## II.  The District Court Erred by Excluding All Expert Testimony and Evidence on the Dose-Response Relationship Between Testicular Cancer and C8 Blood Levels, and by Allowing Specific Causation Opinions That Did Not Consider the Same.

The "primary issue" in specific causation is "whether there has been exposure to a sufficient dose to be a likely cause."  FJC, *Reference Manual on Scientific Evidence*, *Epidemiology* at 638 (3d ed. 2011).  Yet the district court held that expert opinions on Mr. Abbott's dose and his specific resulting amount of increased risk violated DuPont's agreement not to contest general causation.  Order, MDL R.4226, PageID81632-35; Order, MDL R.4079, PageID71855.  It also ruled that, according

---

[6] Exposure to a potentially-harmful chemical does not create an injury for purposes of a negligence claim under Ohio law; actual physical or mental harm is required. *Ackison v. Anchor Packing*, 897 N.E.2d 1118, 1125-26 (Ohio 2008); *see also Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 95-96 (4th Cir. 2011).

to the Science Panel, exposure to the .05 ppb threshold amount for class membership was a sufficient exposure to likely cause Mr. Abbott's cancer. Order, MDL R.5214, PageID126051. Based on those rulings, the court excluded all scientific evidence on the dose-response relationship between C8 and testicular cancer, and all evidence of Mr. Abbott's actual amount of increased risk from his specific C8 blood level. Orders R.125, PageID4406-08; R.85, PageID2703; *Swartz* R.135, PageID4574-78; Motion, *Swartz* R.50, PageID1091-93.

The court's rulings directly contradict the Science Panel's findings that the amount of risk varies greatly with dose, and that some of its data showed that only "very high" blood levels of C8 materially increase an individual's risk. Science Panel Report, MDL R.2813-4, PageID46017, 46019; Science Panel Publication, R.259-1, PageID18432-34. It also contradicts §3.3 of the *Leach* Agreement, by eliminating nearly all of DuPont's bargained-for right to contest specific causation. These errors created an unfair playing field, and require reversal as a matter of law. *See Smelser v. Norfolk S. Ry.*, 105 F.3d 299, 302-03 (6th Cir. 1997) (*de novo* review applies to decisions on whether an expert's reasoning and methodology is scientifically valid).

Plaintiffs repeated the district court's erroneous rulings to the jury, stating that the Science Panel found that .05 ppb was a "cancer-causing level" of C8—thereby avoiding any need to prove Mr. Abbott's actual dose, or actual amount of increased

34

risk. Mr. Abbott's expert, Dr. Pohar, relied on the court's ruling that .05 ppb was sufficient exposure to create a likelihood of specific causation—even though Pohar admitted (outside the presence of the jury) that the Science Panel found no such thing. Trial Proffer, R.261-2, PageID20038. Dr. Pohar admitted that his specific causation opinion did <u>not</u> depend on Mr. Abbott's actual dose of C8, the amount of C8 in his blood, or his increased risk of cancer from his specific C8 blood level.

Under the court's erroneous rulings—which provided the rule of decision for the jury—the only thing necessary to reach a "cancer-causing" level of C8 for Mr. Abbott was exposure to the class membership threshold of .05 ppb for one year. *See, e.g.*, Transcript R.186, PageID7210. The court also improperly excluded all opinions that Mr. Abbott's cancer was more likely caused by his pre-existing germ cell neoplasia in situ (GCNIS) or idiopathic. Order, R125, PageID4406-08.

## A. The Science Panel did not find that the minimum threshold exposure for class membership, .05 ppb of C8, is likely to cause testicular cancer in an individual.

The cornerstone of the court's holdings on specific causation – that .05 ppb of C8 is enough to likely cause testicular cancer – has no factual or scientific basis. The Science Panel actually analyzed whether there were trends of *increasing disease* in persons with *higher cumulative blood levels of C8*. Science Panel Report, MDL R.2813-4, PageID46017, 46019. It found a probable link between C8 and testicular cancer because some of their studies showed that people with higher C8 blood levels

had a greater cancer risk than those with lower blood levels. *Id.*, 46020-21. The Science Panel never found that barely-quantifiable low exposures (like .05 ppb) create a material risk of testicular cancer—much less is *likely* to cause cancer.

In fact, the Science Panel's Report showed that people outside of the highest levels of exposures had *less* testicular cancer than the national average. *Id.*, PageID46019 ("there was little or no evidence of increasing risk in analyses from the same cohort compared with the US population"); *id.*, PageID46017 (comparison to the US population showed an "overall deficit" of testicular cancer); *see also* Science Panel Publication, R.259-1, PageID18433. As confirmed by a Science Panel member, there was no finding that exposure to .05 ppb of C8 increased the risk of cancer at all:

> The Science Panel was not asked to and did not address the question of whether there was <u>any</u> increased risk of cancer from exposure to 0.05 parts per billion in drinking water.

Trial Proffer, R.261-2, PageID20046-47 (emphasis added); Savitz Aff., MDL R.5271-2, PageID128205. Indeed, in a proffer (not before the jury), Mr. Abbott's expert also readily agreed that the Science Panel "did not conclude as a matter of science that .05 parts per billion of C8 in drinking water is capable of causing testicular cancer." Trial Proffer, R.261-2, PageID20038.

Tellingly, the Science Panel never even mentioned .05 ppb in its Probable Link Report. Science Panel Report, MDL R. 2813-4, PageID46010, 46014, 46020-

21. The Science Panel's subsequent peer-reviewed published papers also did <u>not</u> find that infinitesimally small amount of .05 ppb to be scientifically meaningful at all. Science Panel Publication, R.259-1, PageID18430-35; Science Panel Publication, R.261-6, PageID20133-31. Even in the *Leach* Agreement, .05 ppb was nothing but a parenthetical explanation of what was a "quantifiable" amount of C8 based on analytical chemistry at the time, to make the class as large as possible for medical monitoring. Agreement, §2.1.1, MDL R.2813-1. Indeed, .05 ppb was the "minimum" concentration of C8 that could "be determined with known precision and accuracy" when the Agreement was signed in 2004. Transcript, MDL R.4228-2, PageID81678.

As explained in *Rhodes v. E. I. Du Pont de Nemours & Co*., 253 F.R.D. 365, 375 (S.D.W.V. 2008), the .05 ppb number in the *Leach* Agreement has no significance other than to define class membership. The *Rhodes* court recognized "[t]hat level did not constitute a concession by DuPont about the quantity of C8 that must be in drinking water to effect a significant exposure." *Id*. The court misunderstood these basic facts, commenting "the whole point of the Science Panel was that very low doses of this is dangerous .... at only .05 parts per billion." Transcript, R.261-2, PageID20002, 20006.

Based on that error, the court prevented DuPont's experts from giving causation opinions based on the Science Panel's report and its dose-response data as

applied to Mr. Abbott's blood level, and excluded all cross-examination of Mr. Abbott's experts about Mr. Abbott's actual amount of increased risk of testicular cancer based on his specific blood level of C8.  *See, e.g.*, Transcript, R.195, PageID8840-41.  The district court also excluded all opinions that Mr. Abbott's cancer was more likely caused by something other than C8, including all opinions weighing the risk of cancer from his specific C8 blood level.  *See* Order, R.125, PageID4406-08; Order, *Swartz* R.135, PageID4574-78.  Yet Mr. Abbott's measured C8 blood level was 33.1 ppb, which is far lower than the "very high" category (110 to 655 ppb (μg/L))—the only category in one of the Science Panel's studies for which the data showed the potential for a materially increased risk of cancer. Science Panel Publication, R.259-1, PageID18432-34; Science Panel Report, R.2813-4, PageID46017-19.

This error was especially prejudicial, because Plaintiffs' experts testified (contrary to the actual facts) that Mr. Abbott's risk from C8 was very high—and purported to rely on the Science Panel's report and data for that conclusion (*see, e.g.,* Transcript, R.198, PageID9429-30).  Yet the court barred all cross-examination about "increasing risk of disease with increasing blood levels of C-8," and prohibited all cross-examination or testimony about the Science Panel's actual data.  Transcript, R.198, PageID9441-43 (barring questions); *see also id*., PageID9459 (barring questions about the Science Panel and published papers, despite Abbott's expert's

testimony that he relied on those publications). Throughout the *Abbot-Swartz* trial, the court rejected DuPont's many attempts to question experts on the dose-response relationship between an individual's C8 blood-levels and the amount of risk of cancer. Transcript, R.200, PageID9805-06 (rejecting DuPont's proffer); Transcript, R.198, PageID9459 (same); Trial Proffer, R.261-2, PageID20038, 20046-49. The court even rejected the jury's request to see the Science Panel's report at the start of deliberations. Jury Questions, R.178-1, PageID6857, 6861 ("Can we use/see the 2012 Science Panel Report?").

> **B.    Mr. Abbott's specific causation expert should have been excluded because he premised his unscientific opinions on the trial court's erroneous rulings on the Science Panel Report, rather than Mr. Abbott's own dose.**

The court held before trial that DuPont's agreement not to contest general causation allowed Plaintiff's specific causation expert, Dr. Pohar, to opine that C8 likely caused Mr. Abbott's cancer *without considering Mr. Abbott's dose, C8 blood level, or his resulting amount of increased risk from C8. See* R.63, PageID1609 (DuPont motion to exclude Dr. Pohar); Order, R.108, PageID3817 (denying DuPont's motion). This ruling was contrary to both DuPont's reservation of specific causation as a defense under §3.3 of the *Leach* Agreement, and this Court's decision in *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 679 (6th Cir. 2011), which requires specific causation opinions to analyze the dose-response relationship where a chemical exposure is claimed to have caused disease. Under Ohio law, even where

general causation is already proven, "[t]he mere coincidence of exposure and the appearance of a disease is <u>never</u> sufficient to prove causation in an individual instance." *Marcus v. Rusk Heating & Cooling*, 2013-Ohio-528, ¶46 (Ct. App.) (emphasis added) (quoting *Valentine v. PPG Indus.*, 821 N.E.2d 580, 597 (Ohio Ct. App. 2004)).

Violating these fundamental requirements, the court allowed Dr. Pohar to give a specific causation opinion based solely on class membership (exposure to the minimal .05 ppb).   Order, R.108, PageID3823 (incorporating MDL R.4079). Accordingly, Dr. Pohar admitted he performed no analysis of the actual amount of increased risk of cancer created by Mr. Abbott's specific dose of C8:

> Q.   Recognizing that C-8 is capable of causing testicular cancer, did you do anything to assess the relative risk associated with C8 and testicular cancer?
>
> A.   I relied on the expert report of Dr. MacIntosh, who determined that Mr. Abbott was a class member.
>
> **Q.   Aside from the mere - the fact that Mr. Abbott is a class member, did you do anything else to evaluate the relative risk of C-8 causing testicular cancer in this case?**
>
> **A.   No.**

Transcript, R.195, PageID8842-43 (emphasis added).

In a proffer outside hearing of the jury, Dr. Pohar admitted his opinion and reasoning about specific causation for Mr. Abbott was premised only on class membership (i.e., exposure to .05 ppb), not any medical or scientific analysis of Mr.

Abbott's relative risk from his specific blood level of C8. Transcript, R.261-2, PageID19999 ("Q. And based on the fact that Mr. Abbott is a *Leach* class member, you determined that he had a sufficient level of exposure to C8 to cause his testicular cancers; is that fair? A. That's fair. He met the definition of a class member."). Dr. Pohar did not even know Mr. Abbott's C8 blood levels, exposure category, or amount of increased risk from his specific dose of C8. Transcript R.63-2, PageID1689-92; *see also id.*, PageID1692, 1715 (same). And Dr. Pohar did not even consider what Mr. Abbott's C8 blood level was when either of his cancers started— or at any other time. Transcript, R.261-2, PageID20009 ("I have no knowledge about what Mr. Abbott's levels were.").

The court thus allowed Dr. Pohar to improperly assume that DuPont's agreement not to contest *general* causation (that the substance C8 is capable of causing the disease testicular cancer) was enough to prove *specific* causation as to Mr. Abbott. Transcript, R.195, PageID8839. After a colloquy initiated by the court, Dr. Pohar again affirmed before the jury that class membership was enough for him to opine that C8 likely caused Mr. Abbott's cancer. *Id.*, PageID8842-43.

Underscoring the unfair prejudice to DuPont, at the same trial Mrs. Swartz's specific causation expert bolstered Dr. Pohar by opining that exposure to even "one molecule of C-8" was a sufficient amount of C8 to be a likely cause of cancer so long as the plaintiff "was deemed to be a class member." Transcript R.198,

PageID9441-43 (emphasis added). Like Dr. Pohar, that expert relied entirely on the court's decisions on the Science Panel, and made no attempt "to quantify the amount of increased risk" from C8 based on the individual's actual blood level of C8. *Id.*, PageID9434; *see also* R.190, PageID7909 (asking expert to assume, based on the court's interpretation of the Science Panel, that drinking .05 ppb of C8 can cause cancer). Moreover, DuPont's cross-examination was extraordinarily limited, as the court categorically barred any cross-examination about "increasing risk of disease with increasing blood levels of C-8," or the Science Panel's actual data. Transcript, R.198, PageID9441-43, 9459.

Plaintiffs' closing argument capitalized on the unfair prejudice allowed by these errors. Relying on the court's orders, Plaintiffs claimed it was "undisputed" that C8 is a "causative risk factor" "at this level, at 0.05 ppb of exposure for one year." Transcript, R.206, PageID10973. Repeating the court's rulings, Mr. Abbott's lawyers also told the jury that the "the level [of C8] does not matter" for specific causation and that "the only dose that matters is .05 ppb for one year of exposure." *Id.*, PageID11016 (emphasis added).

**C.    The court erred by allowing Plaintiffs to tell the jury that the class membership threshold, .05 ppb of C8, was a sufficient amount to likely cause Mr. Abbott's cancer.**

The court allowed Mr. Abbott to repeatedly and prejudicially state that exposure to .05 ppb of C8 was enough for C8 to be a likely cause of his cancer. DuPont repeatedly asked that the .05 number be excluded from trial, since it was only relevant to class membership (which was not disputed). Notice of Preservation, R.119 (listing objections); Proposed Jury Instruction, R.165-1, PageID6303 (.05 will "confuse and mislead"). Transcript, R.129, PageID4768 ("0.05 should not come into the trial"); Transcript, R.185, PageID7136-37 (arguing the court's .05 rulings would mislead the jury to believe that C8 is the most toxic chemical on Earth).

The court denied DuPont's objections, refused DuPont's requests for limiting instructions, and instead turned DuPont's agreement not to contest general causation (that the substance C8 is capable of causing cancer) into a concession on specific causation (that Mr. Abbott's specific dose of C8 likely caused his cancer). Over DuPont's objections, the court allowed Plaintiffs to tell the jury throughout trial that the Science Panel found that .05 ppb was a "cancer-causing level" of C8. Transcript, R.186, PageID7210 ("cancer causing level of 0.05"), 7211 ("cancer causing levels"), 7262 ("cancer causing levels"), 7270 ("cancer causing levels"); Transcript, R.206, PageID10973 ("known and irrefutable" that "causative risk factor … at this level, 0.05"), 10983 (".05 [ppb] qualifying cancer-causing level of C-8").

The false claim that .05 ppb was a "cancer-causing level" of C8 allowed Mr. Abbott's class membership expert, David MacIntosh, Sc.D. (who knew nothing substantive about causation, or any of the medical evidence), to testify that multiples of .05 ppb created even more danger. He listed the amount of C8 in Mr. Abbott's water for every year in which it exceeded .05 ppb. Transcript, R.190, PageID7941. He added those amounts together to get "93.5," and then stated that Mr. Abbott was exposed to more than 93 times the amount of C8 that was enough to specifically cause Mr. Abbott's cancer, as summarized in this slide:



Slide, R.261-1, PageID19936

Despite DuPont's objections, Plaintiffs' counsel then told the jury that Dr. MacIntosh's analysis showed that Mr. Abbott "was exposed to enough C-8 that it was over 93 times greater than was needed to prove it caused testicular cancer." Transcript, R.186, PageID7211-12 (emphasis added). They claimed "this is the

evidence of the dose … Travis had of the poison that was C8." *Id*. Yet it was just addition applied to the court's erroneous .05 ruling, dressed up as an expert opinion. Dr. MacIntosh did <u>not</u> determine that Mr. Abbott's intermittent exposure to small amounts of C8 likely caused his cancer, nor that it meaningfully increased his individual cancer risk at all—much less by 93 times. Transcript, R.190, PageID7907 (MacIntosh assumed that exposure to .05 ppb was capable of causing Mr. Abbott's testicular cancer). In short, the court's ruling substituted the .05 ppb number for any actual analysis of the issues that should make up specific causation.

DuPont's prediction of jury confusion regarding the .05 number, *see* Proposed Jury Instructions, R.164-3, PageID6289; R.164-4, PageID6290, was proven during deliberations. *See* Jury Question, R.178-1, PageID6860 (commenting that another juror did not "consider as fact that the Science Panel determined that … .05 ppb for at least one year as linked to testicular … cancer," and referring to proximate cause). After this juror question, the court again refused DuPont's request that "the jury be instructed that the 0.05 [ppb] has nothing to do with specific causation." Transcript, R.208, PageID11183.

### D. The court erred by excluding all opinions that Mr. Abbott's cancer was more likely caused by GCNIS, or idiopathic.

The court further erred by barring all expert opinions that an alternative explanation was more likely than C8 to have caused Mr. Abbott's cancer, again on the basis that such opinions interfered with DuPont's agreement not to contest

"general causation." *See* Orders, MDL R.4226, PageID81632-35; *Swartz* R.166, PageID6453-57 (limiting expert testimony). The most relevant alternative cause for Mr. Abbott was germ cell neoplasia in situ (GCNIS), a preexisting condition that exists from birth, triggered by hormone surges at puberty. Transcript, R.201, PageID9975. GCNIS is a precursor of testicular cancer. *Id*., PageID9975-76. Both Mr. Abbott's expert (Dr. Pohar), and DuPont's expert, (Dr. Nichols), agreed on numerous key facts regarding this alternative explanation for Mr. Abbott's cancers, including:

(a) GCNIS is a causative risk factor for testicular germ cell tumors, the precise type of testicular cancers Mr. Abbott had in 1994 and 2015;[7]

(b) GCNIS is not caused by C8;[8]

(c) GCNIS nearly always develops into testicular cancer;[9] and

(d) GCNIS was present in Abbott's testicle that was removed in 2015.[10]

These undisputed facts provided substantial evidence that GCNIS was a highly likely cause of Mr. Abbott's testicular cancers.

---

[7] Transcript, R.201, PageID9975 (Nichols); Transcript, R.261-2, PageID19994-95 (Pohar).

[8] Transcript, R.195, PageID8844 (Pohar). GCNIS was also present at the time of Mr. Abbott's 1994 orchiectomy.

[9] Transcript, R.201, PageID9924-35, 9974 (Nichols); Transcript, R.261-2, PageID19994-95 (Pohar).

[10] Transcript., R.195, PageID8831.

But the court—over DuPont's objections—barred DuPont's expert Dr. Nichols from opining that Mr. Abbott's cancer had any cause that was more likely than C8. Order, R125, PageID4406-08 (holding such an opinion would interfere with the Science Panel's findings). And the court allowed Dr. Pohar to claim there was "no information" on GCNIS in Mr. Abbott's 1994 medical records, Transcript., R.195, PageID8825, even though histologic slides from the 1994 orchiectomy plainly show GCNIS. *Id.,* PageID8864-67 (excluding 1994 slides from trial).

In accordance with its pre-trial ruling, the court affirmatively prevented Dr. Nichols from presenting evidence that GCNIS was more likely than C8 to be the cause of Mr. Abbott's cancer. DuPont's expert Dr. Nichols was preemptively barred from opining that the evidence that GCNIS actually caused Mr. Abbott's cancer was "overwhelming," and the "likelihood is that from the day Mr. Abbott was born, he was destined to have testicular cancer."[11] Transcript, R.65-2, PageID2090. Indeed, the court explicitly told the jury that Dr. Nichols was "not going to give you his opinion on the specific causation of the testicular cancer." Transcript, R.201, PageID9936-38, 9942-44, 9950-53, 9975, 9976-78.

---

[11] During trial, the court said Dr. Nichols failed to offer causation opinions, but the court had earlier excluded his affirmative causation opinions under its prohibition on any opinions that something other than C-8 more likely caused Mr. Abbott's cancer. *See, e.g*., Order, R.125, PageID4406-07.

Both specific causation experts further agreed that the vast majority of testicular cancers are idiopathic, meaning that they result from unknown causes. Transcript, R.261-2, PageID19948; Transcript, R.201, PageID9994. In a differential etiology, an expert considers all relevant potential causes of the symptoms to eliminate various alternative causes. *See Reference Manual on Scientific Evidence* at 617-18. As this Court has recognized, a differential etiology, as was purportedly used by Dr. Pohar, is not sufficient to prove specific causation where a disease is largely idiopathic. *Tamraz v. Lincoln Elec. Co*., 620 F.3d 665, 675 (6th Cir. 2010) (idiopathy is "impossible to ignore and difficult to rule out" in a differential etiology).

"Where the cause of the condition is unknown in the majority of cases," a differential etiology that only takes <u>exposure</u> into account without assessing the <u>actual risk</u> cannot logically conclude the exposure was "the most probable cause." *Bland v. Verizon Wireless*, 538 F.3d 893, 897 (8th Cir. 2008). This is because the most probable cause is still "unknown" unless the actual risk from the chemical exposure can be estimated. *Id*.; *Reference Manual on Scientific Evidence* at 618 (differential etiology is "of little benefit" in evaluating the cause of "diseases for which the causes are largely unknown").

Although Dr. Pohar's exclusion of unknown cause (idiopathy) was inadequate, R.261-2, PageID19948-49, the trial court had already ruled that

48

idiopathy would not be allowed as a defense. *See* Order, R.108, PageID3817 (denying DuPont's motion to exclude Dr. Pohar); Order, *Freeman* R.66, PageID862 (barring idiopathy attacks on plaintiff's experts); Order, MDL R.4532, PageID98553-55 (barring idiopathy opinions from DuPont's experts). While he never analyzed Mr. Abbott's amount of increased risk from his specific dose of C8, Dr. Pohar claimed that the mere presence of C8 meant that the cancer could "not be idiopathic anymore." Transcript, R.198, PageID9364; Transcript, R.261-2, PageID19948-49 (claiming that cancer is only idiopathic if no risk factor is present). Because Dr. Pohar provided no rational basis for excluding idiopathic causation, the court erred by admitting his differential etiology opinion under *Tamraz*.

## III.   The District Court Erred by Ruling in Favor of Mr. Abbott as a Matter of Law on the Statute of Limitations.

Mr. Abbott did not file his lawsuit for his 1994 and October 2015 cancers until November 14, 2017, and it is thus time-barred by Ohio's two-year statute of limitations. O.R.C. §2305.10(A). DuPont presented extensive evidence of early inquiry notice, including that Mr. Abbott released his testicular cancer information to the Science Panel in 2006 to determine if his health had been affected by drinking water containing C8. But the court took the limitations issue away from the jury, ruling as a matter of law that under Ohio's objective test for notice, DuPont's documentary evidence was irrelevant unless DuPont could call a witness to testify that Mr. Abbott had actual notice of the connection between C8 and testicular cancer.

Transcript, R.205, PageID10857, 59; Order, R.241, PageID1222. The court also

erred by finding that the statute of limitations on Mr. Abbott's October 2015 cancer

did not begin to run until a pathologist examined the testicle after it had been

removed to confirm the cancer beyond all doubt.

### A.    The issue of when Mr. Abbott had notice of a link to C8 should have been decided by the jury.

#### 1.    Extensive evidence supported DuPont's statute of limitations defense.

Ohio's statute of limitations incorporates a discovery rule and includes an

objective standard for when the two-year period starts to run:

> [A] cause of action for bodily injury…that is caused by exposure to hazardous or toxic chemicals…accrues upon the date on which…by the exercise of reasonable diligence the plaintiff should have known that the plaintiff has an injury that is related to the exposure.

O.R.C. §2305.10(B). The statute of limitations begins when a plaintiff "discovered

or should have discovered" both the injury and that the injury "was the result of

[defendant's] wrongful conduct." *Twee Jonge Gezellen, Ltd. v. Owens-Illinois, Inc.*,

238 F. App'x 159, 162 (6th Cir. 2007). Mr. Abbott knew he was injured in 1994, so

all he needed was "an '<u>indication</u> of wrongful conduct of the defendant.'" *Id*. at 163

(emphasis in original).

The limitations period runs on inquiry notice, once "a plaintiff discovers or,

through the exercise of reasonable diligence, should have discovered some definitive

information that would reasonably warrant investigation." *Browning v. Burt*, 613

N.E.2d 993, 1006 (Ohio 1993).  The "key … is the word 'reasonable,'" and "[i]t is a trier of fact's job to determine what is reasonable." *Laipply v. Bates*, 849 N.E.2d 308, 312 (Ohio Ct. App. 2006) (emphasis added).

Here, there was abundant evidence of widely publicized information in Mr. Abbott's community that C8 was linked to testicular cancer, that Mr. Abbott was sent actual court approved class notice, in addition to having other notice, and that a reasonable person should have had "an indication" that his testicular cancer was related to C8 far more than two years before Abbott filed his 2017 lawsuit. *Twee*, 238 F. App'x at 162-63.  For example:

- In 2001, *Leach* was filed on behalf of Mr. Abbott and other class members, demanding medical monitoring, and alleging that C8 from DuPont's plant might cause cancer.  In 2004 and 2005, settlement notices were mailed to the class members, including family members of Mr. Abbott, which widely publicized the potential for future individual personal injury claims, and the work to be done by the Science Panel.  Casey Decl., R.170-1, PageID6498-99; 2004 Notice, R.170-1, PageID6503-6508; Transcript, R.204, PageID10813-15; *see, e.g.*, SOL Brief, R.50, PageID1180-91; *see also* Order, MDL R.4215, PageID81296-97 (discussing notices).

- In 2006, Mr. Abbott enrolled in the C8 Health Project, which was established after the *Leach* settlement, and he disclosed his 1994 testicular cancer when completing a "C-8 Health Questionnaire."  Questionnaire, R.252-1, PageID12411, 12430.   In return for payment of several hundred dollars, he agreed to have his blood tested for C8, that the "C-8 Science Panel" would review his medical records, and that the "purpose of the project" was "to find out if your health has been affected by the drinking water in your area." *Id*.; PageID12411, Transcript, R.197, PageID9210-11.  Mr. Abbott's parents and siblings, who knew of his testicular cancer, also participated in the C8 Health Project.  Transcripts, R.194, PageID8633, 8660; R.196, PageID8905-07; R.197, PageID9102-06.

- The media extensively covered the work and findings of the C8 Health Project and the C8 Science Panel. In 2004, the local newspaper ran a front-page article about the *Leach* settlement that, on the next page, discussed scholarships earned by Mr. Abbott and his siblings. Transcript, R.197, PageID9199-9201; Newspapers, R.172-6, at 2-3, R.172-8, at 2, 4. In 2012 and 2013, local media publicized the Science Panel's finding of a probable link between C8 and testicular cancer; the Science Panel held numerous public meetings about its findings; and court-approved "Probable Link" notices were sent to class members. *E.g.*, Newspapers, R.172-17, PageID6693; R.172-15, PageID6672; R.253-1, PageID12883; R.172-14, PageID6655. For example, Mr. Abbott's local community newspaper in Pomeroy, Ohio, had front-page headlines in 2012 connecting C8 to testicular cancer:

# The Daily Sentinel

MIDDLEPORT • POMEROY, OHIO

| INSIDE STORY | WEATHER | SPORTS | OBITUARIES |
|---|---|---|---|
| Fruth to be inducted into 'Hall of Fame' ...Page 2  | Mostly sunny. High of 69. Low of 40 ......Page 3  | High school baseball, softball ...Page 5  |  |

Vol. 62, No. 69                  TUESDAY, APRIL 17, 2012                  50 cents daily

## C8 Science Panel links C8 to testicular, kidney cancer

**Callie Lyons**
*Special to the Gallipolis Daily Tribune*

OHIO VALLEY — An independent panel of three epidemiologists have concluded that exposure to the manufacturing substance known as C8 or PFOA is linked to two types of cancer in Mid-Ohio Valley residents.

The C8 Science Panel released their new findings on Monday morning. It's the latest development in the class action lawsuit brought by local residents against DuPont over the presence of the manufacturing chemical PFOA,

or perfluorooctanoic acid, in their drinking water. As a result of the findings, a medical panel has been established to determine what type of medical monitoring is appropriate for class members.

The class action lawsuit involved residents who lived in areas served by six public water supplies including Belpre, Pomeroy, Tuppers Plains, Little Hocking, Mason County, Ohio and Lubeck, West Virginia. However, since that time, C8 has reportedly been found along every mile of the Ohio River.

What began as the C8 Health Project has become the largest

study ever undertaken to determine the link between PFOA exposure and cancer. An analysis of 21 types of cancer yielded two probable link findings.

The Science Panel, Dr. Kyle Steenland, Dr. Tony Fletcher, and Dr. David Savitz, mapped the areas of analysis to reveal a trend across exposure groups. Fletcher said the groups with the highest risk of testicular and kidney cancer.

"The trend of increase is quite strong," explained Steenland, who described the trend as "unlikely due to chance or bias".

A similar trend was observed with prostate cancer, but fewer cases of the disease were involved in the study.

Fletcher said the newly released information is supported by earlier findings of studies performed on workers and effects observed in lab animals.

Through the review of medical records and the state cancer registry, the panel validated 2,420 diagnoses of primary cancer. Based on past emissions from DuPont and the residential history of study subjects, the panel estimated the levels of C8 in the blood of study

subjects over time. They found a "reasonably consistent and strong relationship" between past exposure and testicular and kidney cancer — both considered rare diseases. Science panel data included 19 confirmed cases of testicular cancer and 113 confirmed cases of kidney cancer.

Steenland warned that there are "limitations that should be recognized". For instance, participants displayed only a few cases of certain cancers like pancreatic and liver cancers, so there may have been inadequate data for a probable link

See PANEL | 3

Transcript, R.197, PageID9226-28; Exhibit R.253-1, PageID12882.

- In 2014, another court-approved notice was mailed to all class members, including Mr. Abbott, explicitly stating the Science Panel found a Probable Link between C8 and testicular cancer. Legal Notice, R.170-1, PageID6499-500, 6571. The court, however, improperly denied DuPont's request for judicial notice of that class notice under Evidence Rule 201. Transcripts, R.204, PageID10584-85; R.205, PageID10842-47; R.202, PageID10200-01.

- In 2014, Mr. Abbott's grandparents and his secretary sued DuPont in connection with Probable Link diseases. Transcripts, R.197, PageID9231-35; R.196, PageID8909-10. Indeed, by January 2015 more than 3,500 other individuals from Mr. Abbott's local community had also filed individual lawsuits against DuPont claiming various injuries they claimed were caused by C8—including numerous testicular cancer claims.

These undisputed facts raised, at the very least, a jury question about when a reasonable person in Mr. Abbott's position would have the requisite notice to start the limitations period. Indeed, widespread publicity or a mailed notice is often enough to charge a plaintiff with that notice as a matter of law. *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000) (recognizing that inquiry notice is an objective standard, and that local front page "publicity was sufficient to charge [plaintiff] with constructive knowledge of the events underlying her cause of action," despite the plaintiff's denials of knowledge). Contrary to the court's ruling here, DuPont has not found any court holding that a simple denial by the plaintiff is enough to remove the issue from the jury.

In addition, as a class member, Mr. Abbott agreed through his class counsel that the *Leach* Agreement's multi-pronged class notice program provided "due and sufficient notice of the matters set forth in the Notice," without any actual notice requirement. *Leach* Agreement, §2.1.2(d), MDL R.2813, PageID45929. The class notice program included the 2012 and 2014 notices that "the Science Panel has found that a 'Probable Link' exists for ... testicular cancer." 2014 Notice, R.170-1, PageID6565 (urging class members to be "screened for testicular cancer").

**2.    The court improperly denied DuPont's right to reasonable inferences as the nonmoving party.**

Ignoring the compelling evidence of notice described above, the court erroneously required DuPont to produce a witness that Mr. Abbott was actually, subjectively aware of the link between C8 and testicular cancer two years prior to filing suit.  Transcript, R.197, PageID9192-93 (requiring "someone who can refute [Mr. Abbott's] testimony").  This used the wrong standard for notice, improperly took the issue from the jury, and would allow any plaintiff to avoid the limitations period by simply claiming "I did not know."  But, as the Supreme Court has held, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are <u>jury functions</u>, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (emphasis added).

The jury has the right to accept, or reject as not credible, any part of any witness' testimony—including Mr. Abbott's. *Toledo v. Schmiedebusch*, 949 N.E.2d 504, 509-10 (Ohio 2011) ("a sworn denial of receipt by [a letter's] addressee creates a question of fact for the jury").  Here, the court improperly construed the evidence about notice against the nonmoving party, DuPont, who instead should have been "given the benefit of all reasonable inferences from the evidence." *Donaldson v. N. Trading Co.*, 612 N.E.2d 754, 757 (Ohio Ct. App. 1992).  The jury could readily have found that a person like Mr. Abbott exercising reasonable diligence would have been on at least inquiry notice about a claim against DuPont for his 1994 cancer

before November 14, 2015 (two years before he filed suit), which would bar his claim.[12]

### B. The issue of when Mr. Abbott had notice of his 2015 cancer also should have been submitted to the jury.

This Court should also reverse the district court's judgment regarding Mr. Abbott's 2015 cancer, and remand for a new trial. By November 5, 2015, "testicular cancer" was noted on Mr. Abbott's medical records, and he had seen numerous specialists who told him that the mass in his remaining testicle was "highly likely" to be testicular cancer and that "he needed to have the testicle removed as soon as possible." *See* Motion, R.50, PageID1195 (listing evidence); Motion, R.169, PageID6478. The court, however, found as a matter of law that the statute of limitations did not begin to run until after the pathologist examined the testicle once it was removed, and confirmed the cancer beyond all doubt. Order, R.131, PageID4866-67; *see* Transcript, R.205, PageID10857.

This ruling is contrary to Ohio law, which holds that "the date of diagnosis is not the appropriate date to begin the tolling of the statute of limitations if [plaintiff] should have become aware at an earlier date that he had been injured." *Bajzel v. Air*

---

[12] The 2005 *Leach* Agreement tolled the start of the time for filing Mr. Abbott's personal injury claims until January 2013, after the Science Panel issued its probable link findings. *See* Notice, MDL R.820-12, PageID11863. Mr. Abbott then had two years (until January 2015) to file suit for his 1994 cancer under Ohio's statute of limitations. O.R.C. §2305.10(A).

*Tool Serv.*, 1990 Ohio App. LEXIS 2257, *6-7 (June 7, 1990).  The occurrence of a "cognizable event"—such as a doctor insisting on the removal of a cancerous testicle—triggers the running of the statute of limitations, and imposes upon the plaintiff the duty to investigate.  *Yaceczko v. Roy*, 2001 Ohio App. LEXIS 52, *7-8 (Jan. 10, 2001) (after a cognizable event, it is "incumbent on that individual to investigate his or her case completely").  The issue of when there was a "cognizable event" with respect to the 2015 cancer should have been decided by the jury.

## CONCLUSION

Each of the district court's errors described above requires reversal and remand for further proceedings.

Respectfully submitted,

/s/ Damond R. Mace
Damond R. Mace
Aneca E. Lasley
Squire Patton Boggs (US) LLP
4900 Key Tower
127 Public Square
Cleveland, OH 44114
Telephone: (216) 479-8500
Fax:  (216) 479-8780
damond.mace@squirepb.com
aneca.lasley@squirepb.com

Lauren S. Kuley
Colter L. Paulson
Squire Patton Boggs (US) LLP
201 E. Fourth Street, Suite 1900
Cincinnati, Ohio 45202

Telephone:  (513) 361-1200
Fax:  (513) 361-1201
lauren.kuley@squirepb.com
colter.paulson@squirepb.com

John A. Burlingame
Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000
Fax: (202) 457-6315
john.burlingame@squirepb.com

*Attorneys for Appellant E. I.*
*du Pont de Nemours and Company*

## DESIGNATION OF DISTRICT COURT DOCUMENTS

**From the _Abbott_ case (Southern District of Ohio, Case No. 2:17-cv-00998):**

| Record No. | Description | PageID |
|:---:|:---|:---:|
| 29 | Amended Complaint | 204 |
| 50 | DuPont's Motion for Summary Judgment on the Statute of Limitations | 1195-1209 |
| 50-10 | Exhibit: Newspaper Article | 1307-1316 |
| 60 | DuPont's Motion to Exclude References to A "Public Health Duty of Care," Or Other Inapplicable or Non-Legal Standards of Conduct | 1599-1601 |
| 61 | DuPont's Motion to Exclude Mischaracterizations Related to the Science Panel and the Probable Link Findings from the Abbott Trial | 1602-03 |
| 62 | DuPont's Motion for Interpretation of The Leach Agreement with Respect to Specific Causation in the Abbott Case | 1605-07 |
| 63 | DuPont's Motion to Exclude the Specific Causation Testimony of Dr. Kamal Pohar | 1608-24 |
| 63-2 | Excerpts of Deposition Transcript of Dr. Kamal S. Pohar on 6/4/19 | 1689-92, 1715 |
| 65-2 | Excerpts of Deposition Transcript of Craig R. Nichols on 6/20/19 | 2090 |
| 107 | Evidentiary Motions Order No. 30, finding Plaintiffs' Motion to Exclude to be moot | 3815 |
| 108 | Evidentiary Motions Order No. 31, denying Defendant's Motion to Exclude Testimony of Plaintiff's Specific Causation Expert | 3817, 3823 |
| 119 | DuPont's Notice of Preservation of Arguments, Objections, and Positions Set Forth in Previously-Addressed Motions In Limine | 4365-70 |

| Record No. | Description | PageID |
|---|---|---|
| 125 | Evidentiary Motions Order No. 32, regarding Plaintiffs' Motion to Exclude Testimony of Defendant's Specific Causation Expert | 4406-08 |
| 129 | Sealed Second Final Pre-Trial Transcript | 4768 |
| 131 | Dispositive Motions Order No. 36, denying DuPont's MSJ on the Statute of Limitations | 4866-67 |
| 164-3 | DuPont's Request for Limiting Instruction on 0.05 ppb (1-25-20) | 6289 |
| 164-4 | DuPont's Request for Limiting Instruction on 0.05 ppb (1-28-20) | 6290 |
| 165-1 | DuPont's Final Combined Set of Proposed Preliminary Jury Instructions with Parties' Objection | 6303 |
| 169 | DuPont's Motion for Judgment as a Matter of Law | 6478 |
| 170-1 | Legal Notices to Class Members and Declaration of S. Casey regarding Leach Class Action Records | 6498-6501, 6503-6508, 6565, 6571 |
| 172-6 | Trial Exhibit: Newspaper | 6608 |
| 172-8 | Trial Exhibit: Newspaper | 6616 |
| 172-14 | Trial Exhibit: Newspaper | 6655 |
| 172-15 | Trial Exhibit: Newspaper | 6672 |
| 172-17 | Trial Exhibit: Newspaper | 6689 |
| 178-1 | Jury Questions during Deliberations | 6857, 6860-61 |
| 183 | Jury Verdict | 6887-6891 |
| 185 | Sealed Jury Trial Transcript for 1/21/20 | 7136-37, 7139 |
| 186 | Jury Trial Transcript for 1/22/20 | 7194, 7210-44, 7384 |
| 188 | Jury Trial Transcript for 1/24/20 | 7684-85, 7692-93, 7704-05 |

| Record No. | Description | PageID |
|---|---|---|
| 190 | Jury Trial Transcript for 1/28/20 | 7907, 7909, 7940-41, 7964, 8041 |
| 192 | Jury Trial Transcript for 1/30/20 | 8292 |
| 193 | Jury Trial Transcript for 2/3/20 | 8434, 8385-86 |
| 194 | Jury Trial Transcript for 2/4/20 | 3695, 8633, 8660 |
| 195 | Jury Trial Transcript for 2/5/20 | 8825, 8831, 8839-44 |
| 196 | Jury Trial Transcript for 2/6/20 | 8905-07, 8909-10 |
| 197 | Jury Trial Transcript for 2/10/20 | 9102-06, 9192-93, 9199-9201, 9210-11, 9226-28, 9231-35 |
| 198 | Jury Trial Transcript for 2/11/20 | 9364, 9434, 9441-43, 9459, 9429-30, 9441-43 |
| 200 | Jury Trial Transcript for 2/13/20 | 9805-06 |
| 201 | Jury Trial Transcript for 2/18/20 | 9924-38, 9942-44, 9950-53, 9974-78, 9994, |
| 202 | Jury Trial Transcript for 2/20/20 | 10200-01 |
| 203 | Jury Trial Transcript for 2/21/20 | 10347 |
| 204 | Jury Trial Transcript for 2/24/20 | 10584-85, 10813-15 |
| 205 | Jury Trial Transcript for 2/25/20 | 10842-47, 10857, 59 |

| Record No. | Description | PageID |
|---|---|---|
| 206 | Jury Trial Transcript for 2/26/20 | 10973, 11016 |
| 207 | Jury Trial Transcript for 2/27/20 | 11148, 11169 |
| 208 | Jury Trial Transcript for 2/28/20 | 11183 |
| 230 | Clerk's Judgment | 12115 |
| 233 | DuPont's Motion for New Trial and Remittitur, Motion to Alter Judgment, Motion for Judgment as a Matter of Law | 12133-55 |
| 245 | Dispositive Motions Order No. 43, regarding Defendant's Motion for Application of Ohio Tort Reform, and for Remittitur or a New Trial | 12331, 12355 |
| 250 | Joint Amended Stipulation for Abbott Case Regarding Prejudgment Interest | 12384-90 |
| 251 | Amended Judgment | 12391-92 |
| 252-1 | Trial Exhibit: Questionnaire | 12411, 12430 |
| 253-1 | Trial Exhibit: Newspaper | 12882-83, 12894, |
| 254-3 | Trial Exhibit: Book | 14012 |
| 259-1 | Trial Exhibit: Publication | 18430-35 |
| 261-1 | Slide - Annual Average PFOA Concentration in Pomeroy & Tuppers' Plains | 19936 |
| 261-2 | Trial Testimony of Plaintiffs' expert Kamal Pohar on 2/9/20, including proffer | 19948-49, 19994-95, 19999, 20002, 20006, 20038, 20045-49 |
| 261-6 | Publication: PFOA Exposures and Incident Cancers among Adults Living Near a Chemical Plant | 20133-31 |
| 262 | DuPont's Notice of Appeal | 20142-45 |

**From the _MDL_ case (Southern District of Ohio, Case No. 2:13-md-02433):**

| Record. No. | Description | PageID |
|---|---|---|
| 34 | Transcript of Status Conference Proceedings held on 7/29/2013 | 218-19 |
| 602 | Case Management Order No. 7 | 9276 |
| 820-12 | Affidavit of Robert A. Bilott in Support of Plaintiff's Motion for Partial Summary Judgment | 11863 |
| 2813-1 | _Leach_ Settlement Agreement | 45928, 45944 |
| 2813-2 | Bilott letter of 1/22/10 | 46004-05 |
| 2813-4 | Science Panel Report | 46010, 46014, 46017-46019-21, |
| 3972 | Dispositive Motions Order No. 1-A, regarding DuPont's Motion for Clarification of Dispositive Motions Order No. 1, Class Membership and Causation | 68171 |
| 4079 | Evidentiary Motions Order No. 1, regarding Plaintiffs' and Defendant's Motions for Expert Opinions Related to Causation | 71855 |
| 4113 | Dispositive Motions Order No. 5, regarding Defendant's Motions for Summary Judgment Related to Specific Causation | 78030 |
| 4184 | Dispositive Motions Order No. 6, regarding Plaintiffs' Motion for Summary Judgment on the Issue of Duty | 80083 |
| 4215 | Dispositive Motions Order No. 10, regarding Application of the Ohio Tort Reform Act | 81292, 81296-97 |
| 4226 | Evidentiary Motions Order No. 1-A, regarding Plaintiffs' Motion to Exclude Cohen Testimony | 81632-35 |
| 4228-2 | Flaherty Run Report Transcript on 7/17/15 | 81678 |
| 4382 | Case Management Order No. 16, denying DuPont's Motion to Stay | 93365-66 |

| Record. No. | Description | PageID |
|---|---|---|
| 4461 | Status Conference Transcript on 4/18/2016 | 96026-31 |
| 4518 | Evidentiary Motions Order No. 4, regarding Idiopathy | 97974-98001 |
| 4532 | Evidentiary Motions Order No. 5, regarding Plaintiff's Motions for Partial Exclusion of Defendant's Causation Experts | 98541-98568 |
| 4535-2 | Douglas & London, P.C.'s 4/12/16 Letter | 98584 |
| 4535-3 | Squire Patton Boggs (US) LLP's 4/12/16 Letter | 98589 |
| 4624 | Case Management Order No. 20, regarding Defendant's Objection to the November 2016 and January 2017 Trial Schedules | 100947 |
| 4777 | Evidentiary Motions Order No. 9, regarding Motions Directed at Plaintiff's Expert Dr. Bahnson and Defense Expert Dr. Luongo | 108894 |
| 5179 | Status Conference Transcript on 11/2/18 | 125537-39 |
| 5188 | Case Management Order No. 28 | 125608 |
| 5208 | DuPont's Response in Opposition to Motion for Summary Judgment | 125922-24, 125934-38, |
| 5214 | Pretrial Order No. 51, regarding Consolidation of Cases for Trial and denying Plaintiffs' Motion to Strike | 126051 |
| 5271-2 | Affidavit of Science Panel Member David Savitz | 128205 |
| 5278 | Response in Opposition to Motion for Summary Judgment on the Application of the Doctrine of Issue Preclusion/Collateral Estoppel | 128443-44 |
| 5285 | Dispositive Motions Order No. 34, granting Plaintiffs' Motion for Application of Issue Preclusion/Collateral Estoppel | 128531, 128544, 128557, 128563, 128570-71, 128574-75, 128582, |

| Record. No. | Description | PageID |
|---|---|---|
| 5294 | Evidentiary Motions Order No. 28, granting Plaintiffs' Motion to Exclude Defendant's Specific Causation Experts in Swartz | 128746 |

**From the _Bartlett_ case (Southern District of Ohio, 2:13-cv-00170):**

| Record. No. | Description | PageID |
|---|---|---|
| 139 | Final Jury Instructions | 6205 |
| 145 | Jury Trial Proceedings Transcript for 10/06/2015 | 6315-16 |
| 164 | Order of USCA as to Notice of Appeal | 8361 |

**From the _Bartlett_ case (Sixth Circuit Court of Appeals, 16-3310):**

| Record. No. | Description | PageID |
|---|---|---|
| 41 | Joint Motion to Dismiss Appeal | N/A |

**From the _Swartz_ case (Southern District of Ohio, 2:18-cv-00136):**

| Record. No. | Description | PageID |
|---|---|---|
| 51-10 | Declaration of Stephen T. Washburn | 1411 |
| 66 | DuPont's Response in Opposition to Motion to Exclude the Opinions and Testimony of Defense Expert Steven Washburn | 1841 |
| 92 | DuPont's Notice of Preservation of Arguments, Objections, and Positions Set Forth in Previously-Addressed Motions In Limine | 2986-2991 |
| 135 | Evidentiary Motions Order No. 28, granting Plaintiffs' Motion to Exclude Defendant's Specific Causation Experts | 4574-78 |
| 190 | Minute Entry for Jury Trial on 3/2/2020 | 7018 |

**From the _Freeman_ case (Southern District of Ohio, 2:13-cv-1103):**

| Record. No. | Description | PageID |
|:---:|:---|:---:|
| 97 | Jury Verdict | 1011 |
| 102 | Final Jury Instructions | 1050 |
| 107 | Jury Trial Transcript for 6/1/2016 | 1516-17 |
| 108 | Jury Trial Transcript for 6/2/2016 | 1678-80 |
| 117 | Redacted Jury Trial Transcript for 6/14/2016 | 3777 |
| 119 | Jury Trial Transcript for 6/16/2016 | 4385 |
| 133 | Jury Trial Transcript for 7/5/2016 | 7673-74 |

**From the _Vigneron_ case (Southern District of Ohio, 2:13-cv-00136):**

| Record. No. | Description | PageID |
|:---:|:---|:---:|
| 141 | Jury Trial Transcript for 11/15/2016 | 2130 |
| 144 | Jury Trial Transcript for 11/18/2016 | 2801 |
| 176 | Jury Verdict | 8220 |
| 188 | Jury Trial Transcript for 12/19/2016 | 8269-70 |
| 195 | Final Jury Instructions | 8617 |

## <u>CERTIFICATE OF COMPLIANCE</u>

In accordance with Fed. R. App. Proc. 32(g), I certify that this brief is written in 14-point Times New Roman font, and contains 12,960 words, exclusive of the material not counted under Fed. R. App. Proc. 32(f) and 6 Cir. R. 32(b)(1).


/s/ Damond R. Mace
Damond R. Mace

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 21, 2021, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Damond R. Mace
Damond R. Mace